Argued September 28, affirmed October 12, 1920, rehearing denied January 18, 1921.

# RASOR *v.* WEST COAST DEVELOPMENT CO.

(192 Pac. 631.)

**Appeal and Error—General Demurrer Could not Reach Defect of Parties not Affecting Cause as a Whole.**

1. In an action by creditors against a portion of stockholders of insolvent corporation, where there was nothing in the pleadings to show that suit was instituted to wind up affairs of corporation, or that it was necessary to ascertain the whole amount of indebtedness, the creditors, or subscribers, who were liable for unpaid stock, suit being brought solely "to obtain the payment of the plaintiffs' judgment, and it does not appear by the bill or otherwise that there are any other creditors who wish to be made parties," the defendants cannot, on appeal, urge by reason of such defect of parties that

their *general demurrer* of no cause of action should have been sustained.

**Corporations—Evidence Held to Show Stock ,to be Unpaid for.**

2. In an action against stockholders of an insolvent corporation, evidence *held* to show that the sole consideration for the stock held by the defendants was their goodwill and influence in promoting a railroad to be built by the corporation.

**Corporations—Goodwill and Influence in Promoting Construction of Railroad not Valid Consideration for Stock.**

3. The mere use of goodwill and influence in promoting the construction of a railroad was neither a valid nor a valuable consideration for corporate stock, as far as liability of stockholders to creditors was concerned.

**Corporations—One not Actually Receiving Stock Held Equitable Owner and Liable to Creditors.**

4. One, who was president and director of a corporation, voted for and appointed a committee of appraisers of options and contracts, and voted for the adoption of its report, and agreed that the person obtaining the contracts and options was to receive certain stock therefor, which was to be apportioned among the officers, including the president, the stock being issued to the person furnishing the options and contracts pursuant to such agreement, was in equity and good conscience the owner and holder of the stock which he was to receive, even though he did not actually receive it, and he was liable to creditors as a subscriber for stock, on the corporation becoming insolvent.

**Corporations—Creditors had Right to Assume That Capital Stock was of Par Value.**

5. In the absence of knowledge of the actual facts or conditions under which stockholders of a corporation acquired their stock, creditors had the right to assume that the corporation was organized according to ordinary business practices, and that its capital stock was of par value, and was paid for on that basis.

**Interest—Judgment Bears Same Interest as Written Contract on Which Founded.**

6. A judgment against a corporation, founded upon a written contract providing for the payment of money with interest at 8 per cent, should bear interest at the same rate.

From Coos: JOHN S. COKE, Judge.

Department 2.

The plaintiffs are engineers with principal office in Los Angeles, California. The West Coast Development Company is an Oregon corporation, with principal office and place of business at Bandon, in Coos

County. It has a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each. The remaining defendants are residents of that county. It is alleged that the defendant Carter was the owner of 51 shares of stock in the defendant corporation; that Murphey owned 50 shares, Dyer 50 shares, Stephen Gallier 51 shares, E. M. Gallier 51 shares, and R. H. Rosa 52 shares; that the stock owned and held by each of them was issued as fully paid, but that in truth and in fact no part of it was ever paid for; that after the corporation was organized it became indebted to the plaintiffs; and that it wholly failed to pay its obligation or any part thereof.

It is alleged, and admitted by the defendants, that an action was brought against the corporation for the amount due; that on April 23, 1915, judgment was rendered against the defendant company for $4,829.22, with $16.20 costs, bearing interest at 8 per cent per annum; that no appeal was ever taken therefrom; that no part of it has ever been paid by the defendants; and that the corporation is insolvent. The defendants claim, however, that the judgment is void and without consideration.

The plaintiffs say that they notified each of the stockholders to pay the judgment and make good the amount of the difference between the par value of the stock owned by each of them, and the amount actually paid for it. The prayer is for a decree determining the amount remaining due to the corporation from the defendant stockholders on the shares owned by each of them; that it be deemed an asset of the corporation for the benefit of the plaintiffs, to be applied in satisfaction of their claim; and that the plaintiffs have a several judgment against each of the defendants for the amount found to be due

on the stock held by them individually, "to such an extent as may be necessary for the full and complete satisfaction of plaintiffs' claim against the defendant corporation."

The corporation made default. The remaining defendants demurred generally to the complaint, on the ground that it did not state facts sufficient to constitute a cause of suit against either of them. This objection was overruled, and they then filed a joint answer, admitting the allegations concerning the number of shares of stock subscribed and the par value thereof, but denying that "750 shares were issued, or any number in excess of 743."

As a further and separate answer the defendant Stephen Gallier alleges that he subscribed for one share of stock only, for which he paid in full; that he never agreed in writing or otherwise to pay more than the $100, and that he does not owe the corporation anything. He avers that any stock held by him over and above the single share for which he subscribed was transferred to him by one J. W. Roberts, the previous holder thereof; that any of such stock issued to Roberts was fully paid; and that the transfer from Roberts was for no consideration "other than as hereinafter alleged." Like defenses are pleaded by each of the other defendants. It is further alleged that the West Coast Development Company was organized by C. W. Lake and J. W. Roberts for the purpose of dealing in real estate along the route of a proposed railroad to be promoted by them, of which the business was to be separate and distinct from that of the defendant corporation; that through their efforts the defendants were induced to subscribe for one or two shares of stock for the purpose of completing the organiza-

tion of the defendant company; that at the time of
its organization Roberts subscribed for 500 shares
of its stock of the par value of $50,000, and that in
consideration therefor he transferred to the defend-
ant corporation a large number of contracts, several
hundred acres of tide-land adjoining the town of
Bandon, and options, which the corporation deemed
to be worth the full amount of his subscription.

It is averred that the proposed railroad was
"furthered and promoted by said Gallier brothers,
Rosa, Dyer, Carter, Murphey, and other Bandon
residents, including the said Lake and Roberts"; that
to insure the success of the railroad whereby the
defendant corporation was expected to profit, "the
said Lake and Roberts from time to time for moneys
paid and advanced by different persons, issued and
transferred from the 500 block of stock held by
Roberts, bonuses, gifts, and inducements which were
understood by all parties at the time as being fully
paid stock"; and that it was never contemplated that
any of the defendants owed anything or should pay
any additional sum for the stock which they received
from Roberts.  As the defendants allege, "none of
said assignees of said stock so transferred from
Roberts owe anything to the corporation therefor."
It is further stated that "the subscription, collection,
and disbursement of such sum [paid in by the de-
fendants] was to a small extent induced by the issu-
ing of the collateral, bonus, and representations
made by the West Coast Development Company and
its several agents and sponsors," and that the de-
fendant corporation issued all stock long before the
plaintiffs became its creditors.  It is claimed that
the defendant corporation had no power to promote
a railroad; that the indebtedness due the plaintiffs

was for a survey; that their employment was *ultra vires;* and that the judgment is null and void.

The plaintiffs replied, denying all of the material allegations of the answers. A trial resulted in a decree in their favor against each of the defendants Stephen and E. M. Gallier, Carter, Murphey, and Rosa for $1,055 and against Dyer for $1,012.74, with costs. All of these defendants appeal.

AFFIRMED.

For appellants there was a brief over the names of *Mr. L. A. Liljeqvist* and *Mr. C. R. Wade,* with an oral argument by *Mr. Liljeqvist.*

For respondents there was a brief and an oral argument by *Mr. J. T. Brand.*

JOHNS, J.—1. This suit was brought, and the decree was rendered for the sole use and benefit of the plaintiffs. It appears from the evidence that it is against a portion only of the stockholders of the corporation. The sole ground of demurrer is "that the complaint does not state facts sufficient to constitute a cause of suit." There was no plea in abatement and the fact that there were other stockholders was not called to the attention of the court by any pleading, motion, or affidavit. By reason of the fact that the suit was brought for the benefit of the plaintiffs only, and that there are other stockholders, the defendants for the first time in this court contend that the general demurrer should have been sustained. Some authorities from other jurisdictions are cited, which apparently support their contention. In *Brundage* v. *Monumental Gold & Silver Min. Co.,* 12 Or. 322 (7 Pac. 314), this court held:

"In a suit by a creditor to enforce the individual liability of a stockholder for a debt of the corporation, it is not necessary that all the creditors of the corporation be joined, nor that all the stockholders be made defendants.

"In such a suit, if a defendant stockholder desires other stockholders to be made parties, he must bring them in at his own expense by an answer or other proper proceeding.

"When the object of the suit is to wind up the affairs of an insolvent corporation, and it becomes necessary to ascertain the whole amount of the indebtedness, and to whom due, and who are liable to contribute upon unpaid stock subscriptions, such suit should be in the name and for the benefit of all the creditors, and against all the stockholders found within the jurisdiction."

In the instant case there is nothing in the pleadings tending to show that the suit was instituted to settle or wind up the affairs of an insolvent corporation, or that it is necessary to ascertain the whole amount of indebtedness, the creditors, or subscribers who are liable for unpaid stock. The suit was brought solely "to obtain the payment of the plaintiffs' judgment, and it does not appear by the bill or otherwise that there are any other creditors who wish to be made parties." Upon such a record the defendants have no right at this time to complain of a defect of parties on either side.

At the organization of the defendant corporation, Roberts formally subscribed for 500 shares of its capital stock, Rosa for two shares, Stephen Gallier one, E. M. Gallier one, Jamieson two and Dyer two, making a total of 508 shares then subscribed. It appears that the eight shares last enumerated were fully paid up. The defendants admit that a total of 743 shares of stock was issued. The remaining 235

shares were issued from time to time after the company was organized. In legal effect, the defendants contend that the Roberts stock and the other 235 shares were fully paid up.

The record shows that on February 28, 1912, at a meeting of the board of directors, at which were present the defendants Dyer, Stephen Gallier and E. M. Gallier, the following motion was unanimously adopted:

"That three members of the corporation in good standing be appointed as appraisers for the purpose of determining the value of all services rendered in procuring options, bonds, rights of way, selling stock, legal services, secretary's compensation, and each and all things pertaining to the general promotion organization and complete organization of this corporation; and that said committee after appraising same be required to report thereon at the earliest convenient date."

Stephen Gallier, E. M. Gallier, and C. W. Lake were appointed as the committee. On March 1, 1912, another meeting of the board was held, at which all of the directors were present, and the following proceedings were had:

"Minutes of the previous meeting were read and approved. The report of the appraising committee was read, and upon motion by Stephen Gallier, seconded by E. M. Gallier, the report was unanimously accepted upon being put to an aye and nay vote. Moved by E. M. Gallier and seconded by Elbert Dyer, that the company issue to J. W. Roberts or his order, stock of the West Coast Dev. Co. to the amount of $50,000, in liquidation of the report as submitted, stock to be issued fully paid."

If any written report of the committee was ever made, it is missing and cannot be found.

At or about the time of the organization, Roberts had obtained certain options for rights of way for a proposed railroad to be constructed from Bandon to Medford, and they were taken in the name of the defendant corporation or for its use and benefit. No titles were acquired, and no consideration was paid for such options. They were merely the result of the personal services of Roberts for two or three months, assisted by the individual defendants and other citizens of Bandon who were interested in the construction of the proposed railroad. That was the sole consideration which the corporation received for the Roberts block of 500 shares of stock, and was to be deemed a payment in full for the same.

The defendant Stephen Gallier testified thus:

"Q. Would you estimate his [Roberts'] services in obtaining these options and contracts, if any, were worth $50,000 at that time,—is that correct?

"A. It must have been. * *

"Q. Mr. Roberts secured the options, but the options ran to the West Coast Development Company?

"A. Yes, sir. * *

"Q. But you felt in view of the work that your brother and the others performed, that it would be fair to give yourselves twenty-five shares apiece at that time?

"A. Probably so. * *

"Q. Was it in consideration of the time you put in that they issued the twenty-five shares which are shown in certificate 8, issued on that date?

"A. It must have been.

"Q. What else could it have been done for, except for services?

"A. That is all. * *

"Q. On this issue of twenty-five shares to E. M. Gallier, shown in stub of certificate 9, as being issued on March 2, 1912, to E. M. Gallier, that represents compensation for the services he rendered?

"A. It would apply to my case exactly, as near as I can remember. * *

"Q. How do you explain the issuance of twenty-five shares, of par value of twenty-five hundred dollars, to E. M. Gallier, after the corporation had been organized only a month, or month and a half, as compensation for his services for part time work?

"A. The only way I can explain that would be the influence he may have, or something.

"Q. The influence he might have?

"A. That is the only way I could figure that out.

"Q. These stock payments given you and him were in the nature of bonuses to see to it that your influence was right on the development project?

"A. Yes, sir.

"Q. That is the real truth of it?

"A. I don't know but what it is.

"Q. There is no doubt about it.

"A. I guess not.

"Q. The same thing was true with reference to the stock that was given to the other defendants?

"A. It might have been. * *

"Q. What would you say was the reasonable value of E. M. Gallier's time per month, you are better fit to know than anyone else?

"A. Probably one hundred dollars per month.

"Q. This second block of twenty-five shares was also issued by the corporation in the way of a bonus to procure your influence for the company?

"A. I presume it was. * *

"Q. But the stock-book shows that the shares were issued directly from the company to Mr. Carter?

"A. Yes, sir.

"Q. That is a true transaction?

"A. That is a true transaction.

"Q. And the same would be true with reference to the stock issued to your brother E. M. Gallier?

"A. Yes, and W. P. Murphey.

"Q. And E. Dyer?

"A. Yes, sir.

"Q. As far as you know there was no understanding that Roberts was to divvy up with these others?

"A. I don't remember that he was to divvy up his stock.

"Q. You were a member of the committee that made that appraisal, and also a director at that time?

"A. Yes. * *

"Q. It was a bonus given to you for helping things along?

"A. For promoting the railroad. * *

"Q. Do you not know that it was the plan of Mr. Roberts to divide up the issue of this stock with you, and Dyer, and others of his associates as a compensation for this right of way and preliminary survey, and options taken by them at both Bandon and Port Orford?

"A. That is the way I understood it at the time. * *

"Q. Is there a shred of record of any kind in the West Coast Development Company to indicate that a single property right actually owned by Roberts was sold by him to the West Coast Development Company, and in that question I am not referring to options which he procured, but I refer to property rights which he owned and sold?

"A. Not to my memory.

"Q. When the stock was issued to him there was no new property turned over to the corporation to the value of a dollar, was there?

"A. No, I don't know as there was. * *

"Q. I understood you to say that Roberts planned to divide the stock among the rest of you, and that you knew that at the time. That is true, is it?

"A. That is as near as I remember; he would pay us fellows in stock.

"Q. That was sort of a gentlemen's understanding?

"A. Yes, sir.

"Q And that was at the time this appraisement committee met?

"A. I think it was; I would not be positive; when we went into this proposition.

"Q. When the appraisement committee met and voted him five hundred shares, it was with a gentlemen's agreement between the committee and Mr.

Roberts that a portion of those shares were to be transferred back to the members of the committee, and to the other directors and organizers of the company?

"A. The company in general, I think so.

"Q. The amount of stock which was voted to Roberts was not determined merely by the value of his services of any kind, but you determined that amount, and then added another amount, which was estimated, and which should be divided among others who had worked, is that true?

"A. Yes, I think that was true. * *

"Q. (By the Court.) Was the stock that was issued to the defendants in this action, Stephen Gallier, Ed. Gallier, C. C. Carter, W. P. Murphey, R. H. Rosa, and E. E. Dyer, issued to them out of the five hundred shares that had been subscribed by Roberts? Was that the understanding at the time that was issued?

"A. It was out of the five hundred shares; yes, I think it was. As I understood Mr. Roberts the stock that he issued to us would be for our services.

"Q. Instead of having the five hundred shares issued to him, he would have the five hundred shares, less the shares issued to you and these other defendants?

"A. I think it was."

The defendant Dyer gave the following testimony:

"A. We then organized two companies; one as a holding company and the other as a railroad company. The holding company turned out to be the West Coast Development Company, and the West Coast Development Company was to handle the finances to promote the railroad, to secure the rights of way, and for compensation for securing the rights of way they were to receive a certain amount of stock in the railroad company after it was financed. * * The fifty thousand dollars was voted practically as a bonus to take care of the right of way and the options, and we were all to share in that fifty thousand dollars that Roberts was supposed to get. * *

"Q. Do you know whether Roberts remained through the entire period or not?

"A. Roberts went away about the time that the corporation was organized. * *

"Q. You were present at the time this fifty thousand dollars' worth of stock was voted?

"A. Yes, sir. * * Pursuant to an arrangement I just mentioned with Mr. Roberts in regard to the fifty thousand dollar stock bonus. Of course we were all to share in that, and the right of way was to be turned over to the railroad company to make the value; that was the idea.

"Q. This block was not issued to Roberts?

"A. No, it was issued to his order; the stock was voted to be issued to his order, and of course it was supposed to be divided among us promoters.

"Q. That is the stock which was originally voted was to be divided among the promoters?

"A. Yes, sir.

"Q. You stated in your direct examination—were you all to share in the five hundred shares?

"A. Yes, everyone that exerted his influence or spent his time was to have the benefit of that stock.

"Q. What arrangement was there as to the division?

"A. There was none—no definite arrangement as to the division.

"Q. It was agreed that Roberts and Lake might make the division?

"A. That was the understanding; Lake was the man that practically handled the matter.

"Q. He was selected by the directors to do that?

"A. Yes, sir.

"Q. You expected to profit by that along with the rest?

"A. Yes, sir.

"Q. That was the understanding between you?

"A. That was practically the understanding.

"Q. And he did issue to you fifty shares of stock as shown by the books?

"A. The books show that he did, but he never delivered it.

"Q. (By the Court.) So the stock that was actually issued to those defendants, that is, C. C. Carter,

98 Or.—38

Murphey, Gallier, Rosa and E. E. Dyer, was a part of these five hundred shares which were to be issued to Roberts?

"A. The bulk of it was. I think Murphey and Carter received twenty-five hundred dollars' worth each, or something like that, outside of the fifty thousand dollars' worth. * *

"A. It is stipulated that it is the position of the defendants that all the stock issued to the defendants on the second of March, 1912, was a part of the five hundred shares voted to be issued and delivered to J. W. Roberts, and that may be considered as evidence in this case. But the defendants do not claim the stock issued subsequently to some of the members was a part of these five hundred shares; but it is claimed that the shares subsequently voted to E. M. Gallier, C. C. Carter and Stephen Gallier were for other services and duly authorized at other times. * *

"A. In order to organize a corporation under the laws of this state you have to have half the stock subscribed; in order to get that subscription of course Mr. Roberts subscribed for the full half of it, with the understanding that it was to be later divided among the promoters according to what the bunch seemed to think they had earned. That is the way it was, and it was practically left up to Lake—he was the secretary of the company—to divide the stock as he saw fit. * *

"Q. The stock was in truth issued by the corporation and given—

"A. To the different individuals who performed the services. Mr. Roberts got his proportion as the records show.

"Q. The stock out of this block of five hundred shares was issued on March 2d, and was distributed exclusively among the bunch who promoted the corporation?

"A. Yes, sir. * *

"Q. And this act of the corporation in voting and issuing five hundred shares to Roberts was merely a device to make it appear that the laws of the State of Oregon had been complied with?

"A. That is all. * *

"A. Other than what stock was subscribed for, there was some seven or eight hundred dollars' worth of stock that was actually subscribed for, and the money was supposed to be paid in.

"Q. That is about all the money that was subscribed in money?

"A. That is all I think, seven or eight hundred dollars.

"Q. In the entire corporation?

"A. Yes, sir.

"Q. The fact is, this corporation was mostly on paper and in water?

"A. Of course it was a promotion scheme; that is all there was to it.

"Q. (By the Court.) You said the consideration for the issuance of the stock to the defendants was the services performed by them, and the influence exercised by them in behalf of this plan of promoting the building of a railroad, and for services thereafter to be performed. Did that apply to the defendants E. M. Gallier and Stephen Gallier, and, if so, how did it happen that additional stock was issued to them?

"A. Additional stock was issued to them for services that they performed later on.

"Q. Were those services, or were they not, contemplated in this original agreement or understanding?

"A. No, they were not. At the division of this stock it was contemplated that each one at that time had done suffic nt amount of work to be entitled to the amount of stock issued, and later on the two Galliers, and also Mr. Murphey and Mr. Carter, performed additional services, and they were voted more stock to compensate them for those services."

C. C. Carter gave the following testimony:

"Q. Do you know what you got stock from the West Coast Development Company for?

"A. There was no consideration in the letter when I got it, stating what purpose it was for.

"Q. Do you think it was in some way compensation for your services?

"A. I would think so.

"Q. As a bonus in this proposition?

"A. I would think so."

2, 3. The testimony is conclusive that all of the Roberts options were acquired for the use and benefit of the defendant corporation; that not a dollar was ever paid for, or any title acquired under any one of them; that they did not have any value; and that the only claim of Roberts against the corporation would be for personal services in procuring the options. The evidence also shows beyond contradiction that the resolution of the board which treated the Roberts stock as fully paid was adopted with the understanding and agreement that some of the defendants were to have portions of it for their goodwill and influence in obtaining options and promoting the construction of the proposed railroad, and that such portions of that stock were actually issued pursuant to the agreement, the next day after the resolution was adopted. Thereafter, following the same general plan, for a like consideration the remaining stock of the defendants was issued to and accepted by them. Exclusive of the eight shares originally subscribed and paid for by them, none of the defendants ever paid any money to the defendant corporation for any of the stock. As we construe the record, the defendants are respectively the owners and holders of the number of shares of stock in the defendant corporation alleged in the complaint, and the sole consideration therefor, exclusive of the eight shares, was their goodwill and influence in promoting the construction of the railroad from Bandon to Grants Pass or Medford. That is against public policy, as being neither a valid nor a valuable consideration.

4. It is contended that Dyer never received his stock. He was president and a director of the company, voted for and appointed the committee of appraisers, and voted for the adoption of its report. The testimony is conclusive that it was then agreed by the officers and directors that the Roberts stock was to be apportioned among them, and that the stock was issued pursuant to such agreement. In equity and good conscience, this would constitute Dyer the owner and holder of his stock, even though he did not actually receive it.

5. There is no allegation in the complaint of any specific act of fraud. The suit is founded upon the liability of stockholders for unpaid stock. But the proof is conclusive that legally a fraud was committed in the manner and method in which the stock was issued and the defendants became the owners and holders of their respective shares. It is contended, and the testimony indicates, that the defendants were acting in good faith, without any intent to defraud. But there is no allegation or proof that the plaintiffs had any knowledge of the actual facts or the conditions under which the defendants acquired their stock. In the absence of such information they would have a right to assume that the corporation was organized according to ordinary business practices, and that its capital stock was of par value. *McAllister* v. *American Hospital Assn.,* 62 Or. 530 (125 Pac. 286), is in point. It is there held:

"Only the legal holder of stock is liable for an unpaid portion of the subscription price, so that a person who took the equitable title of shares as indemnity for liability upon the corporation's note to a bank did not thereby become liable on the stock either to the corporation or to its creditors as owner.

"Though persons securing shares of stock in a corporation at a price less than par expressly contract that their liability shall be limited to the price paid, and do not formally subscribe to the stock, a subscription is presumed from any agreement or act by which the stock is acquired from the corporation, and such persons are subscribers within Article XI, Section 3, of the Constitution, providing that stockholders of all corporations shall be liable for an indebtedness of said corporation to the amount of their stock subscribed and unpaid."

The opinion by Mr. Chief Justice EAKIN reads as follows:

"Therefore, the holders of the stock issued as a bonus or gift to promoters, or otherwise disposed of by the corporation for less than par value, are liable accordingly for the par value of the stock to creditors who have acted upon the faith of the capital as represented by the stock."

The court there quotes with approval the following excerpt from *Harrison* v. *Remington Paper Co.*, 140 Fed. 385 (72 C. C. A. 405, 5 Ann. Cas. 314, 3 L. R. A. (N. S.) 954):

"The Constitution, the statutes under which the corporation is organized, and the established rules of law in force when he becomes a stockholder, are read into and become a part of this contract. By his subscription for the stock, or by his receipt and acceptance of it, he solemnly agrees, in consideration of the benefits derived from its ownership, that he will faithfully perform the obligations and discharge the duties imposed upon a stockholder by the Constitution, the statutes, and the law."

6. It is contended that the decree should not bear interest at the rate of 8 per cent per annum. The judgment against the defendant corporation was founded upon a written contract for the payment of money, which expressly provided for interest at that

rate, and the decree follows the contract. After a careful consideration of the numerous questions ably presented, the decree is affirmed.

AFFIRMED.   REHEARING DENIED.

BENSON, BURNETT and BEAN, JJ., concur.