Argued March 19; reargued June 29; affirmed July 31; rehearing
denied September 12, 1933

COMPTON *v.* PERKINS ET AL.

(24 P. (2d) 670)

*Dexter Rice,* of Roseburg (Rice & Orcutt, of Roseburg, on the brief), for appellants.

*Carl E. Wimberly* and *M. L. Hallmark,* both of Roseburg (Ralph A. Coan, of Portland, on the brief), for respondent.

ROSSMAN, J. A narrative of the facts will enable us to state in a better manner our disposition of the assignments of error. The complaint names as defendants twenty-four individuals, but since only two of them, J. W. Perkins and Carrie B. Perkins, have appealed, we shall, for convenience, refer to them as the defendants.

J. W. Perkins came to Roseburg in 1909 where he engaged in the investment business. Some years previously he had lived in the state of Indiana where, according to his testimony, he acquired information about the operation of oil wells. Upon locating in Roseburg, he displayed interest in the possibility of discovering oil in the surrounding territory. Companies organized for the exploration for oil, with which he was associated, failed. In April of 1923, John C. Edsall, whom some of the witnesses described as a geologist and mining engineer, called upon Perkins and convinced him that he was a competent oil man. Since Edsall was without financial resources, Perkins assured him, at the conclusion of the conversation, that he would help him financially if he (Edsall) undertook to locate an oil structure in the vicinity of Roseburg. Following their conversation, Edsall made some trips in the surrounding region, and about the middle of April, 1923, reported to Perkins that he had found an oil structure. The two then visited the purported

oil field to which the witnesses referred as the North Deer Creek field, located about seven or eight miles east of Roseburg. In one of their conversations, the two men, according to Perkins, agreed that they would make the oil venture a joint undertaking; that is, Edsall would contribute his knowledge as a geologist and locate some one who would finance the corporation which they would create, and Perkins would supply Edsall with needed living expenses and obtain the leases on the land when the oil structure had been located. They further agreed that each should share equally in the profits of the venture, including an even division of corporate stock issued in consideration of rights conveyed by them to the corporation. After Edsall had discovered the so-called North Deer Creek field, Perkins obtained leases upon virtually all of the 5,000 acres comprising the field and also upon another tract of 3,000 acres known as the Stewart-Jones field which Edsall also believed promised the production of oil. In doing so he visited the landowners, accompanied by a notary public. The notary's services, he claimed, cost him $5 per day, and he also paid to the landowner $1 cash consideration for the lease. As a witness, he estimated that he had sustained an expense of $1,000 to $1,500 in financing Edsall and in procuring the leases. He, however, displayed no cancelled checks, no receipts and testified that he had made no entries in any books. According to Perkins, Edsall, pursuant to his agreement to find some one who would finance the development of the property, produced one O. F. Dillman, whom Perkins described as an experienced oil man. He was without funds and apparently was a stock salesman. July 25, 1923, Perkins, Edsall, Dillman and two others organized the Roseburg Oil & Gas Company. The articles provided that its capi-

tal stock should consist of 125,000 shares of a par value of $1 each. The corporate records show that on that day Dillman and Edsall each subscribed for 40,-000 shares of stock, and Perkins for 100 shares. Three other individuals, one of whom was the attorney employed by the incorporators, subscribed for a total of 500 shares. Upon the same day Dillman, Edsall, Perkins and two others were elected directors, and then all five cast their ballots in favor of a resolution which recited that Perkins, Dillman and Edsall had obtained the aforementioned leases, and

"WHEREAS, the said J. W. Perkins, O. F. Dillman and J. C. Edsall have offered to assign, transfer and set over to this company all of said leases, the same leases now standing in the name of J. W. Perkins, as lessee, and the makers of the leases and the number of acres covered by each lease being as follows: * * *

The consideration for said leases to be 80,000 shares of the capital stock of this corporation fully paid and the performing of the covenants hereinafter set out in the form of assignments herein and made a part of this resolution, and

"WHEREAS, the said J. W. Perkins, O. F. Dillman and J. C. Edsall have offered to reassign to this company 50,000 shares of the capital stock of this company to be sold and the proceeds thereof used in the purchase of machinery, sinking of wells and developing of the property covered by said leases,

"NOW, THEREFORE, BE IT RESOLVED by the Board of Directors of this company at its regular meeting held in the city of Portland, Oregon, that the offer of said J. W. Perkins, O. F. Dillman and J. C. Edsall be accepted."

The resolution directed that the instrument accepting the leases should provide that the corporation

should discharge all of the covenants of the leases "and further agrees  *  *  *

(3) To pay on or before the last day of each month one-sixteenth part or share to Julian W. Perkins, the assignor herein, and one-sixteenth part or share to John C. Edsall, of Roseburg, Oregon, of all oil and gas produced and saved from said premises during the preceding month by delivering the said oil and gas into pipe lines for their credit at the prevailing prices for said oil or gas at that time, and  *  *  *"

The resolution also recited:

"BE IT FURTHER RESOLVED, that it is the judgment of this Board of Directors that the said oil and gas leases are of the fair and reasonable value of $80,000.00 or approximately $10.00 per acre, and we find that sum to be the reasonable value thereof.

"AND BE IT FURTHER RESOLVED, that the president of this corporation be, and he is hereby, authorized to receive from the said O. F. Dillman and J. C. Edsall 50,000 shares of the capital stock of this company which the said parties have heretofore offered to surrender to this company, and the president is authorized to place the said 50,000 shares of the capital stock of this company on the market to raise money for buying machinery and for developing purposes on said property.  *  *  *"

After Perkins had assigned the leases to the corporation, the latter undertook the drilling of a well, but after reaching a depth of 200 feet abandoned the undertaking without having discovered oil or gas. Still later, after the corporation had been adjudged a bankrupt, claims filed against it to the extent of $8,802.49 received the approval of the referee in bankruptcy. The total receipts of the trustee in bankruptcy amount to $1,146.63.

The uncontradicted testimony shows that no oil or gas in commercial quantities has been discovered

in this state. The plaintiff testified that, although not a geologist, "I am well acquainted with everything done in regard to oil in Douglas county" and that he has "had as much to do with them (oil leases) as anyone in this territory". Based upon his experience, his examination of this land, and "statements made to me by men who have more experience than I, and also upon reports of experts of the highest standing", he believed that the leases, on July 25, 1923, were without value. The report to which he referred was received in evidence without objection and is before us. It is entitled "Geologic Atlas" and consists of a report upon a geological survey of the land surrounding Roseburg, made by a geologist in the employ of the Department of the Interior, whose qualifications the defendants concede. W. F. Kernin, a resident of Roseburg, who had obtained oil leases in Douglas county, testified that oil leases in the year 1923 possessed no market value. Sam Foster, a witness for the defendants, testified that he had had twenty years' experience in the procuring, purchase and sale of oil leases almost entirely in other states. He testified that "there is a great deal of difference" between the value of an oil lease upon ground in a proven field and upon ground in an unproven field, but that a lease upon land in an unproven field was worth $2 an acre, and that if a competent geologist reported the discovery of an oil structure in such a field the leases would be worth $10 an acre. Although he was unfamiliar with Edsall's report, and had never seen these lands, he expressed the opinion that the leases were worth $10 an acre. C. A. Lillisburg, a real estate broker, who was a witness for the defendants, testified that some oil leases upon a thirty-acre tract in the vicinity of what is known as Leeper Dome had sold for $8 an acre, and leases upon another

tract of 300 acres similarly situated had sold for $5 an acre. Leeper Dome is near Sutherlin, and, according to the witnesses, presents geological features more favorable to the production of oil than those of the North Deer Creek field. At the time of the sales mentioned by Lillisburg, oil wells were being drilled in the vicinity of Leeper Dome. C. C. Fristoe, a geologist and mining engineer, residing at Sutherlin, testified that a sale of oil leases covering a 500-acre tract of land in the vicinity of Sutherlin was made for $5,000, and that leases upon another tract of 300 acres had sold for $1,500. At the time of these sales, oil drills were in operation in the immediate vicinity of these two tracts. He added, however, that in these instances only one-eighth of the oil extracted from the ground was to be reserved from the assignee of the lease, and that it would make "a difference" if another one-eighth was reserved as an "overwriting royalty". When asked if he knew the market value of these leases in July, 1923, he testified: "I have no idea. I never saw the land and do not know whether there is a structure there or not". J. F. Ewell, a witness for the defendants, testified that he had experience with oil and gas leases in Oklahoma and in Coos county, Oregon. He testified: "Large companies will allow $2 an acre for going out and getting the leases signed up and after they are signed up they become worth from $5 to $10 an acre". He knew of no oil companies that were paying any sums for oil leases in Douglas county. He was unable to estimate the value which the Perkins' leases had in July, 1923. He testified that the total reserved from the producing company ordinarily is not more than one-eighth of the oil taken from the land. J. W. Todd, a witness called by the defendants, testified that "off and on since 1913" he

had been engaged "in the leasing game" in Montana, Wyoming, Oklahoma and Texas. When asked for the value of oil leases, he replied: "In Texas and Oklahoma a set rule of $2 without a geological report. With a geological report it runs anywhere—well, I never saw a piece of land sell for less than $10 and from that on up in a wild cat territory. When you put a rig on, the land is more valuable, never less than $10 when there is a good geological report". J. Ellis Loreman, a witness for the defendants, described himself as "a geological engineer, specializing in oil producing areas". He had inspected the North Deer Creek field and, after describing its geological formations, expressed the opinion that "there would be as good a possibility there for an oil structure as any place else". He testified that oil leases upon ground, where the field has received a favorable report from a competent geologist, are worth from $2 to $15 an acre. He also testified that, although fifty oil wells had been drilled in this state without the discovery of oil, "there are good reasons to believe" that oil will be found in abundant quantities. He knew of no one who would have purchased the Perkins' leases in July, 1923, and was aware of no market for them. The defendant Perkins testified that at the time of the organization of the Roseburg Oil & Gas Company he had faith in the North Deer Creek field for the production of oil, and that Edsall had reported to him that he had found a perfect structure. He testified that he believed the leases were worth $80,000, but avoided answering a question which inquired whether they could have been sold for $20,000 cash. When asked whether he knew of any one who would have purchased the leases in July of 1923, he replied: "No, I wasn't interested in that end of the business".

The complaint, after averring that the Roseburg Oil & Gas Company had an authorized capital of 125,000 shares of stock of a par value of $1 each, that it was adjudged a bankrupt, that plaintiff qualified after appointment as its trustee, that he had obtained authority to institute this suit, alleged, among other things, the following:

"The said corporation did issue to defendant J. C. Edsall, by direct issue to him, J. C. Edsall, by certificate of stock No. 15, on or about September 15, 1923, five thousand shares of the capital stock of the said Roseburg Oil and Gas Company, for which he, the said J. C. Edsall, paid nothing whatsoever; that thereafter, by transfer of said stock as evidenced by said certificate of stock No. 15, by the issuance of stock certificates Nos. 144 and 145, on or about the 4th day of March, 1924, said J. C. Edsall did transfer four thousand shares of the capital stock of said Roseburg Oil and Gas Company to defendant J. W. Perkins; that he, the said defendant J. W. Perkins, well knew that the said J. C. Edsall had paid nothing whatsoever for said stock; that he, the said defendant J. W. Perkins, received and ever since has kept and retained said stock, and said stock has never been paid for nor anything whatsoever been paid thereon."

Substantially the same allegations are made concerning the stock transferred by Edsall to the defendant Carrie B. Perkins, with the exception of the number of shares transferred and the certificate numbers.

The defendants demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. After the demurrer had been overruled both defendants filed answers, which admitted the incorporation of the Roseburg Oil & Gas Company, the fact that it was later adjudged a bankrupt, that plaintiff became trustee of its estate, that the corporation had issued to Edsall 5,000 shares of its

corporate stock, that Edsall had transferred 4,000 of these shares to the defendant J. W. Perkins and 1,000 shares to the defendant Carrie B. Perkins. The answers denied virtually all other averments of the complaint. The answer of J. W. Perkins alleges:

"The Roseburg Oil & Gas Company was, and still is, a corporation duly organized under and by virtue of the laws of the state of Oregon, and that said corporation did on or about September 15, 1923, the exact date being at this time unknown to this defendant, issue to one J. C. Edsall 5,000 shares of the capital stock of said corporation, and that said Edsall at the time said corporate stock was issued to him did fully pay and satisfy said corporation for said stock and the same was issued to him fully paid and nonassessable; and that thereafter for a valuable consideration the said Edsall did transfer 4,000 shares of said corporate stock to this defendant."

The answer of Carrie B. Perkins contained an averment substantially similar to the one just quoted except it alleged the transfer of 1,000 shares to herself.

The reply denied the answers' averments of payment, and then alleged that the defendant J. W. Perkins obtained the leases to which we referred in discussing the testimony "at a very small cost and for the purpose of assigning the same to said corporation; that said leases were valueless and were at all times known to the said defendants to be valueless; that upon the organization of said corporation five directors of said corporation, including the three defendants above named, were elected; that on or about the 25th day of July, 1923, said defendants above named and said corporation, acting through its board of directors, entered into an agreement, pursuant to a resolution of said board of directors, wherein and whereby said defendants agreed to assign said leases to said corporation

in consideration of the issuance to them of 80,000 shares of its capital stock, and that payment to each of said defendants J. W. Perkins and J. C. Edsall of one-sixteenth of all gas and oil produced and saved from said premises covered by said leases. * * *''

The three individuals to whom the above excerpt refers are J. W. Perkins, J. C. Edsall and O. F. Dillman. Continuing, the reply avers that 5,000 of the aforementioned 80,000 shares were transferred by Edsall to the two defendants Perkins. To the new matter alleged in the replies, the defendants demurred ''for the reason that it appears upon the face of said first, further and separate reply that the same does not constitute a defense or answer to said defendants' first, further and separate answer''. The demurrers were overruled.

■ The first assignment of error challenges the order of the circuit court which overruled defendants' demurrers to the complaint. In support of their contention, the defendants argue that the complaint fails to allege that either Edsall or these defendants contracted to pay for the stock or received it as owners. But we believe that the missing averments are supplied by the answers. It is a familiar rule of pleading that when an essential fact, omitted from a complaint, is supplied by the answer, the defect is cured. *Brown v. Hilleary*, 133 Or. 26 (286 P. 593); *Lauderback v. Multnomah County*, 111 Or. 681 (226 P. 697); 49 C. J., Pleading, p. 863, § 1273. We conclude that this assignment of error discloses no merit.

■ The second assignment of error is predicated upon the order of the circuit court which overruled the demurrers to the replies. In support of their contention, the defendants argue that the complaint seeks payment

from the defendants for the stock on the theory that no payment had ever been made therefor, while the reply admits that the directors had acknowledged payment but seeks to impeach their action by charging fraud. Section 1-617, Oregon Code 1930, provides: "The defendant may demur to any new matter contained in the reply when it appears upon the face thereof that such matter is not a sufficient reply to the facts stated in the answer". The holdings in *Wiley v. Whitney,* 76 Or. 92 (146 P. 1093, 147 P. 938, and *Brown v. Baker,* 39 Or. 66, 65 P. 799, 66 P. 193), indicate strongly that a demurrer cannot be employed for the purpose of taking advantage of a departure. In view of these decisions, and the fact that our code makes no mention of departure as a ground for a demurrer, we conclude that the circuit court did not err when it overruled the demurrers.

■■ The third assignment of error is based upon the action of the trial judge in overruling a motion made by the defendants' counsel during the course of the cross-examination of the plaintiff whereby the defendants moved "to strike out all the testimony of this witness relative to the value of the oil leases assigned by the Roseburg Oil & Gas Company by resolution of the board of directors on the ground of departure". Upon direct examination, the witness had testified, without objection, that the Perkins leases had no value, and had also explained his reasons for that opinion. Upon cross-examination, the defendants had directed to the witnesses ten questions concerning the value of the leases and had received answers before they made the motion which we are now considering. It will be observed that their motion sought to strike out these ten answers as well as the others. Ordinarily, a party can-

not assign as error the admission of evidence which he has elicited by the cross-examination of his adversary's witnesses. 4 C. J., Appeal and Error, p. 703, § 2613. Moreover, a party cannot speculate upon the character of proof and, having received answers unsatisfactory to himself, move to strike them from the record. It is our opinion that this assignment of error discloses no merit.

■ The fourth assignment of error is predicated upon the contention that the plaintiff cannot recover because (a) as the representative of the corporation, he is bound by its own agreements, of which the agreement to exchange 80,000 shares of stock for the lease is one; and (b) as the representative of the creditors, he cannot recover because he has neither alleged nor proved any fraudulent conduct of the directors.

The federal Supreme Court, in *Harrigan v. Bergdoll*, 270 U. S. 560 (70 L. Ed. 733, 46 S. Ct. 413), recently pointed out:

"The nature, the extent, and the conditions of the liability of a stockholder on account of stock not fullpaid depend primarily upon the law of the state or country by which the corporation was created. Glenn v. Liggett, 135 U. S. 533, 548. Compare Benedict v. Ratner, 268 U. S. 353, 359. That law determines whether the liability is to the corporation or is to creditors. Compare Converse v. Hamilton, 224 U. S. 243, 253. Selig v. Hamilton, 234 U. S. 652, 658. If the liability is to the corporation it passes like other choses in action to the trustee in bankruptcy. The bankrupt law does not modify this right of action against the stockholder or create a new one. It merely provides that the right created by the state law shall pass to the trustee and be enforced by him for the benefit of creditors."

Under the practice of our state, it may be that if the plaintiff, as trustee of the bankrupt's estate, pos-

sessed no greater rights than those which the corporation could enforce, he could not maintain this suit. *Crumley v. Crumley Business College,* 120 Or. 306 (252 P. 85, 56 A. L. R. 392); Fletcher Cyclopedia Corporations (Permanent Ed.) § 5226. But these stock subscriptions, if unpaid in whole or in part, upon the bankruptcy of the corporation, passed, like the other assets of the corporation, into the possession of the plaintiff, as trustees of the estate. Under our practice, he is the proper individual to maintain this suit. *Crocker v. Gentry,* 127 Or. 168 (271 P. 38); *Falco v. Kaupisch Creamery Co.,* 42 Or. 422 (70 P. 286).

▇▇▇ The constitution of Oregon (Art. XI, § 3) makes the stockholders of corporations "liable for the indebtedness of said corporation to the amount of their stock subscribed and unpaid". Section 25-218, Oregon Code 1930, provides:

"All sales of stock * * * subject such purchaser to the payment of any unpaid balance due, or to become due, on such stock; but if the sale be voluntary, the seller is still liable to existing creditors for the amount of such balance, unless the same be duly paid by such purchaser; provided, that any corporation formed under the laws of this state may purchase real or personal property, including the stock of any other corporation, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be fully paid stock and not liable to any assessment; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of property purchased shall be conclusive."

Creditors who have dealt with the corporation on the faith of the stock being fully paid for are not bound by agreements between the directors and subscribers whereby the latter receive stock without being required to pay its par value. *Crocker v. Gentry,*

supra; *Atwell v. Schmitt*, 111 Or. 96 (225 P. 325);
*Rasor v. West Coast Development Co.*, 98 Or. 581 (192
P. 631); *Falco v. Kaupisch Creamery Co.*, supra. The
authorities just cited point out that the trustee in bankruptcy, as representative of the creditors, is likewise
not bound by any transactions whereby a subscriber
for corporate stock is permitted to secure the stock
without making payment for its par value. He may,
therefore, maintain a suit to impeach such transactions
and enforce payment of the unpaid balance. A transaction of the kind now before us, wherein the alleged
illegal agreement is said to have been facilitated
through an advantage taken of the corporation by the
purchasers who dealt with themselves as directors
was certainly voidable, if not entirely void. *Rugger v.
Mt. Hood Electric Co.*, 143 Or. 193 (20 P. (2d) 412);
Thompson on Corporations (3d Ed.), § 1332. In his
effort to impeach the transaction, the plaintiff alleged
that the defendants had not paid for their stock, that
the leases were valueless, and that three of the five
directors who voted to transfer 80,000 of its shares of
stock, in consideration for them, were personally interested in the transaction. It will be observed from the
provisions of our statute previously quoted that a subscriber may pay for his stock with property or money,
and that when property is accepted the judgment of the
directors as to the value of the property is conclusive
in the absence of fraud. In *Atwell v. Schmitt*, 111 Or. 96
(225 P. 325), this court said:

"The judgment of the directors of a corporation
upon the value of property or stock to be taken and
accepted by the corporation in exchange for its own
stock in payment of a subscription contract, the exercise of which, when acted upon, is made conclusive by
statute, refers to an honest attempt to determine the

value of the property or stock by a board of directors representing the corporation alone and jealous of its rights and interests and anxious to secure for the corporation all that it is justly entitled to. Anything less than that is dishonest and fraudulent. The directors may be honestly mistaken. They may exercise a very poor judgment and make a very poor bargain, but this is wholly immaterial so long as they have no personal interests of their own to further and act fairly and honestly by the corporation they profess to represent. The defendant relies upon the transfer of these options and the acceptance by the corporation of the transfers as a sufficient payment, under the statute, to discharge him from the obligations of his subscription contract. * * * But when it also appears, as it does here, that the parties transferring these options to the corporation at such a gross overvaluation were the very parties who pretended to accept the transfer on behalf of the corporation and that they alone were in the control of the corporation and that the personal interest of each was subserved by the acceptance of the transfer in exchange for the stock, it conclusively establishes fraud. In the transaction involved here there was not such an exercise of judgment by the directors as to the value of the options as the statute intended should be exercised by a board of directors in the purchase of property or stock, and for that reason the pretended exercise of judgment by the directors is not conclusive upon any creditor of the corporation. And from this it follows that defendant's indebtedness to the corporation upon his subscription, which exceeds the amount of plaintiff's judgment, is wholly unpaid and should be subjected to the payment of plaintiff's judgment so far as necessary to satisfy said judgment.''

In *Rugger v. Mt. Hood Electric Co.*, supra, we refused to yield corporate effect to action by the board of directors when it appeared that a majority of those casting the vote were personally interested in the

transaction. In our present suit three of the five directors who cast votes in favor of the adoption of the resolution which found the Perkins' leases equal in value to the 80,000 shares of stock had a direct interest in the leases. Based upon our holdings in *Rugger v. Mt. Hood Electric Co.,* supra, and *Atwell v. Schmitt,* supra, it is evident that the adoption of this resolution by the vote of those interested in the leases cannot be deemed an exercise of judgment by the directors of the corporation, which becomes conclusive upon the corporation by virtue of section 25-218, Oregon Code 1930, previously quoted. We shall, therefore, ignore the resolution's appraisal of the value of the leases. Let us, therefore, consider the evidence, a review of which is stated in previous paragraphs of this decision. The plaintiff and another witness testified that these leases possessed no value. They cost Perkins a sum not exceeding $1,500. He told the plaintiff that the sum was approximately $250. No witness testified that an oil lease which reserved from its owner one-fourth of the oil taken from the soil, like the Perkins' leases, possessed any value. None of the witnesses testified that there was a market for Oregon oil leases in this state in 1923. Sam Foster, who was the only witness who testified that these leases were worth $10 an acre, had not seen the land, was unfamiliar with Edsall's report, and did not know that one-fourth of the oil was reserved from the lease-owner. The defendant Perkins, who owned these leases and who had been interested in oil ventures in Douglas county since 1909, as a witness, avoided making an estimate of their value. Although it was his duty, as a director, to ascertain the value of these leases before transferring from the corporation 80,000 shares of its stock as consideration for

them, he declared, as a witness: "I wasn't interested in that end of the business". It will be recalled that the stock subscription books reveal Perkins as the subscriber for only 100 shares of stock and that he permitted Dillman and Edsall to receive the 80,000 shares issued in consideration of the leases. From these two circumstances, an inference is permissible, in the absence of explanation, that Perkins doubted the value of the consideration which the corporation was receiving for 80,000 of its shares of stock. Another circumstance which strongly indicates that he doubted the value of the leases is the fact that the moment he discovered that Dillman proposed to sell stock in this corporation in Douglas county, he insistently demanded that he be permitted to resign as a director. The defendants contend that when a corporation is organized to develop mining properties the ordinary rules governing the estimate of value placed upon property conveyed to it by those promoting the corporation are relaxed. However, our statute (sec. 25-218) makes no exception in behalf of such ventures and by it we are bound.

It is generally difficult to determine value precisely, and hence since honest men frequently differ in their appraisements, caution suggests the wisdom of allowing a margin for differences of opinion. However, the law always determines value in terms of actual cash. Where the directors have no personal interest antagonistic to the corporation, their estimates of the value of the property exchanged for stock is entitled to much weight. The value of an item of property transferred to a corporation for some of its stock in lieu of cash should be appraised as of the day of transfer, and the value then assigned to it

should not be deemed excessive merely because later developments were unfavorable to the property. It is the duty of the directors to see to it that property accepted by the corporation in place of money possesses value equal to the par value of the stock. Let us now apply these rules to the present problem. There is no evidence before us that the leases, with their reservation of 25 per cent of the oil from the lease-owner, possessed any value. Lease market conditions in Oklahoma, Texas, and California for leases upon oil lands in those states afford no assistance in the solution of the problem before us. The plaintiff and another witness testified that these leases were without value. The defendant Perkins, when confronted with this testimony, avoided estimating their value. Yet for fourteen years he had been interested in oil ventures in Douglas county, and, as director of the corporation, it was his duty to know the value of the leases before he transferred to himself and his two associates 80,000 shares of the company's stock. It is our opinion that the evidence warrants a conclusion that the leases were without value, and that their assignment to the corporation did not discharge the subscribers' debt to the corporation.

The question remains whether the plaintiff's pleadings are capable of supporting the decree of the circuit court. This is the only portion of the final assignment of error upon which we have not expressed an opinion. The complaint, as we have seen, alleges nonpayment of the stock as the basis of recovery. We are of the opinion that it should also have alleged the illegal conduct of the directors whereby they sought to release themselves from payment. The plaintiff has contended throughout that an averment of nonpayment

sufficed until the defendants alleged payment, and that it was not incumbent upon him to charge fraud until a plea of payment had been interposed. Such is the rule where recovery is sought upon a sale made by a party who now appears as the plaintiff, but this plaintiff sold nothing to the defendants. As previously stated, the action of the directors was not void but voidable. The complaint, therefore, should have averred the misconduct of the directors. Thompson on Corporations (3d Ed.) § 4002. Thus an averment was missing which should have been present. But the answer alleged payment, and, in replying to the averments of the answer, the plaintiff made the allegations which, if present in the complaint, would make that pleading complete. Under the practice of this state, a reply can aid a complaint and supply an essential fact omitted from it when its averments meet an issue submitted by the answer. *Easton v. Quackenbush,* 86 Or. 374 (168 P. 631); *Skinner v. Furnas,* 82 Or. 414 (161 P. 962); *Auxier v. Auxier,* 181 Ky. 614 (205 S. W. 684); *Fry v. Knouse,* 142 Wash. 500 (253 P. 802). Still another reason presents itself why this error of the pleader should not cause a reversal. The authors of our code of procedure foresaw that their rules of pleading would occasionally be inadvertently violated and that many of these violations would not prejudice the other party. They, therefore, provided (§ 1-911, Oregon Code 1930): "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party". Section 7-510 provides: "Upon an appeal from a judgment, the same shall only be reviewed as to questions of law appearing upon the transcript, and shall only be reversed or modified for errors sub-

stantially affecting the rights of the appellant". In *Wiley v. Whitney*, 76 Or. 92 (146 P. 1093, 147 P. 938), we held that a departure which did not prevent the defendant from having a fair trial was not sufficient cause for a reversal. Article VII, § 3, Oregon constitution, gives us power to affirm the judgment notwithstanding error in the circuit court if the judgment was such as should have been entered. An instance of the exercise of that power where a rule of practice was violated in the circuit court is *First National Bank v. Rusk*, 64 Or. 35 (127 P. 780, 129 P. 121, 44 L. R. A. (N. S.) 138). No showing has been made that the absence of the averment from the complaint which was supplied by the reply misled the defendants or prevented them from having a fair trial. It is our opinion that the plaintiff's pleading supports the decree, and that the aforementioned error in the pleadings does not constitute sufficient ground for a reversal.

It follows that the decree of the circuit court is affirmed.

BEAN, CAMPBELL and BAILEY, JJ., concur.

RAND, C. J., did not participate in this decision.

KELLY and BELT, JJ., dissent.