Francis H. FARNUM, Jr.

v.

C. J. MERRILL, INC.

Supreme Judicial Court of Maine.

April 8, 1970.

———◆———

John J. Flaherty and David M. Cohen, Portland, for receiver Harry A Marcus.

William B. Mahoney, David M. Fisher, Jr., and M. Roberts Hunt, Portland, for Maine Nat. Bank.

Merton G. Henry and George J. Mitchell, Portland, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, and WEATHERBEE, JJ.

MARDEN, Justice.

On appeal. This controversy arises out of the Receivership of C. J. Merrill, Inc. (Merrill), and conflicting claims under the provisions of our Maine Uniform Commercial Code (Code) 11 M.R.S.A. and specifically Section 9, Secured Transactions, by a financing Bank and the Receiver to certain assets of the company. The trial court ruled in favor of the Bank, and permitted Receiver to appeal. Reference to the Code will appear by Section number only except as to 9–306, and 9–301, which are quoted for convenience. Other pertinent provisions of Code also conform to the official text.

Pertinent facts are summarized as follows:

Keyes Fibre Company (Keyes) by purchase order dated February 10, 1966 authorized Merrill to custom-build at Portland, Maine, for delivery to Fairfield, Maine, a dryer with a contract price of $240,163.00, the payment for which was to be made eleven months after delivery.

Keyes was aware on or about February 21, 1966 that Merrill was to finance the construction of the dryer by loans from First National Bank of Portland (Bank), that Merrill proposed to assign the purchase order to Bank as collateral for advances and Keyes and Merrill agreed that the payment for the dryer would be made to Merrill and Bank as joint payees.

Over date of February 28, 1966 four instruments were executed between Merrill and Bank.

a) Assignment by Merrill to Bank of rights under the purchase order from Keyes.

It is stipulated that the contract right specified in the assignment was then a significant part of the outstanding accounts or contract rights of Merrill. (9–302(1) (d) [e]).

b) Security agreement covering the dryer with specificity, identifying it as the subject of the Keyes-Merrill purchase order.

This was upon a printed form purporting to comply with the Code in terms of "Equipment and Consumer Goods" as collateral. The dryer does not fall within the Code definition of equipment (9–109(2)), or consumer goods (9–109(1)), but no point is made of this aberration. Inasmuch as the place of filing is the same for equipment and inventory (9–401(1) (d)),[1] into which latter category the dryer falls (9–109(4)), no prejudice results. It also provided, inter alia, (additional provisions (3)) that the debtor (Merrill) should "not transfer any interest in the Collateral" and upon sale of any of the Col-

---

1. Maine. 9–401(1) varies from the official text of the Code, but the filing here is not an issue.

lateral or appointment of a receiver (5) Bank might declare all obligations due and "shall then have the remedies of a secured party under the Maine Uniform Commercial Code."

c) Financing statement on approved form (U.C.C. 1) describing the dryer as in the security agreement.

This statement was filed (recorded) with the Secretary of State on March 2, 1966 (9–401(1) (d)), and by appropriate entry thereon indicated that "proceeds of collateral are also covered."

d) Demand note by Merrill to Bank for $55,000.00 representing Bank's first advance to Merrill and listing as collateral security the dryer (as described in the Keyes purchase order, the security agreement and the financing statement), the purchase order Keyes to Merrill, and the assignment Merrill to Bank, which last two instruments were deposited with Bank.

A second note dated May 16, 1966 bore the same entry as to collateral and nine subsequent notes incorporated the recitation of collateral by reference.

The dryer was fabricated by Merrill and delivered to Keyes on November 30, 1966. Payment for it became due October 30, 1967.

It is conceded that Keyes was not a buyer in the ordinary course of business within the Code (1–201(9)).

Merrill was the subject of "insolvency proceedings" (1–201(22)) and Receiver was appointed September 8, 1967.

It is stipulated that at least one of the creditors of Merrill had no knowledge of the alleged security interest of the Bank, by reason of which Receiver is a "lien creditor" within the Code (9–301(3)).

Seasonably thereafter and before October 30, 1967 Bank and Receiver each made demand on Keyes that payment for the dryer be made to demandant. Keyes has paid neither one, and awaits adjudication of the dispute.

By reason of these conflicting interests an order was issued by the single Justice who had entertained the Receivership, requiring the Bank to establish the validity of its alleged security interest. The issue was submitted by stipulations and exhibits prepared by the Receiver and Bank jointly, upon which the Court ruled that the Bank was entitled to the proceeds from the dryer, and Receiver was permitted to appeal.

An issue as to the validity of this appeal was raised before the single Justice, but this issue is not briefed and is considered waived.

The ultimate issue is whether there was error in the ruling that the Bank as against the Receiver has a perfected security interest in the money representing the purchase price of the dryer.

Our consideration begins with the concession by Receiver in his brief that while the dryer was in the possession of Merrill, Bank had a perfected security interest in the machine and its proceeds. It is obvious that the dryer was manufactured for sale and delivery to Keyes, as to which all parties were aware. Keyes took the dryer free of Bank's security interest, not as a buyer in the ordinary course of business under 9–307(1) but by reason of the sale to it by Merrill being authorized by Bank under 9–306(2). This fact creates the competition for the unpaid purchase price.

The basic facts place Bank with a perfected (agreed) purchase money security interest (9–107(2)) in tangible collateral (9–105(1) (c)) (dryer) of the inventory category (9–109(4)) with a declaration in the financing statement that "proceeds of collateral are also covered." This leads us to 9–306 which provides:

"(1) 'Proceeds' include whatever is received when collateral or proceeds is sold, * * *. The term also includes

the account arising when the right to payment is earned under a contract right. Money, checks and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.'

"(2) Except where this Article otherwise provides, a security interest continues * * * in any identifiable proceeds including collections received by the debtor.

"(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor, unless

(a) A filed financing statement covering the original collateral also covers proceeds; * * *

\* \* \* \* \* \*

"(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

(a) In identifiable noncash proceeds;

(b) In identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings; * * *.

\* \* \* \* \* \*

■ Receiver enters the controversy subject to 9–301 which states:

"(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of

\* \* \* \* \* \*

(b) A person who becomes a lien creditor without knowledge of the security interest and before it is perfected;

\* \* \* \* \* \*."

The stipulation recorded above, that not all of Merrill's creditors had knowledge of Bank's security interest, qualifies Receiver as a "lien creditor," by definition, under 9–301(3) with priority over an *unperfected* security interest.

This narrows the issue into whether the Bank's perfected security interest in the proceeds from the sale of the dryer, covers the unpaid purchase price.

Receiver urges first that the Bank has no claim to "proceeds" for there were no "proceeds" received by Merrill prior to the receivership, which he contends, is a prerequisite under 9–306(1).

■ The Receiver urges secondly that at the time of the appointment of the Receiver, Merrill had an account receivable against Keyes, but that this account receivable was not proceeds from the collateral (dryer) but proceeds from a contract right, in which Bank had not perfected any security interest. Receiver urges that for Bank to have acquired a security interest in the contract right against Keyes, it should have filed a financing statement with respect to it.

The stipulation recited earlier in this opinion that the assignment "transferred a significant part of the outstanding accounts or contract rights of Merrill" did not exclude the contract right from that class of collateral as to which a filed financial statement was necessary if a creditor desired to perfect a security interest in it (9–302(1) (d) [e]), *as such,—* which, we add, is to be distinguished from derivative perfection of a security interest in the contract right as "proceeds."

These contentions point up one of the many problems under Section 9 which are

stated but not solved definitively by treatise[2] and only to a limited extent by judicial decision. See Annot. 30 A.L.R.2d 9.

Upon the premises established, the question becomes one of determining what the proceeds from the dryer are. The first sentence of 9–306 defines "proceeds" as including "whatever is received when collateral *or proceeds* is sold." (Emphasis added.) Receiver does not question that an account receivable arose in favor of Merrill upon delivery of the dryer, but insists that this receivable was not proceeds from the dryer but from the contract right which was the subject of the assignment.

■ Under Code this account receivable is more specifically a "contract right," meaning "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." (9–106)

The purchase order does not fall within Code definition of an instrument (9–105 (1) (g)) or chattel paper (9–105 (1) (b)).

In turn this "contract right" is, by definition, (9–306(1) supra) "noncash proceeds," unquestionably identifiable, in which Bank has a perfected security interest (9–306(1), and (4) (a) supra).

Section 9–306 goes further and declares that "proceeds" include whatever is received when "proceeds" (noncash) "is * * collected."

■ Granting this, Receiver continues to urge that Merrill has never received the payment (proceeds) from the contract right (noncash proceeds) and the intervention of the receivership somehow per se severs the perfected security interest of Bank.

Code does not even suggest this result and while eminent counsel concede a lack of Code case law covering the current situation, analogies may be applied, for unless "displaced" by the Code, the principles of law and equity supplement its provisions (1–103).

In a contest between maker of a special bank deposit and receiver of the bank, see Fogg v. Tyler, 109 Me. 109, 82 A. 1008, 39 L.R.A.,N.S., 847. In contest between mortgagee and trustee in bankruptcy of the mortgagor for proceeds from sale of mortgaged property, see First National Bank of Auburn v. Eastern Trust & Banking Company et al., 108 Me. 79, 79 A. 4. In neither case did the advent of the representative of general creditors cut off the plaintiff's entitlement to the proceeds (here used in a non-code sense).

■ There is no doubt in the minds of treatise writers that the perfected security interest of the inventory financer reaches the variant forms of proceeds defined in 9–306, if he indicates in his financing statement that proceeds are to be covered.

"(I)f he does so, his interest in the proceeds continues perfected * * * as long as the filing remains effective. * * If he does not so claim proceeds, his interest in the proceeds lapses— 'becomes unperfected'—unless he separately perfects as to proceeds." 9–306(3). Gilmore, supra, Footnote 2, § 27.3 at page 729.

■ As to proceeds in the "accounts receivable" class, "so long as the proceeds interest in accounts continues perfected under § 9–306(3) the inventory financer apparently cannot be subordinated, apart

2. See Gilmore, Security Interests in Personal Property §§ 27.4, 29.2, 29.3, 29.4, 45.9; Coogan-Hogan-Vagts, Secured Transactions under U.C.C. §§ 15.08, 15.10, 24.04, 24.05 and Chapter 24B Original Collateral and Proceeds, A Code Puzzle; William D. Hawkland, A Transactional Guide to the Uniform Commercial Code § 2.32; John A. Spanogle, Jr., Maine Practice, Chapter D pages 390–392; Ray D. Henson, "Proceeds" under the Uniform Commercial Code, 65 Columbia L.R. 232 (1965); Oscar Spiback, Financing the Manufacturer; and Article 9 of the Uniform Commercial Code, 48 Ky.L.Jnl. 397 (1959–60).

from agreement, to any type of subsequently accruing claim. It should be noted that the interest in proceeds continues only so long as the proceeds (including collections received by the debtor) remain 'identifiable.' The interest continues, therefore, in the account so long as it remains unpaid and in collections received so long as the collections themselves remain identifiable * * *." *Gilmore, supra,* § 27.4 at page 735.

In discussing the secured creditor versus a trustee in bankruptcy (Gilmore), Chapter 45, in discussing 9–306(4) says "(a)s to such proceeds—which can still be identified or traced as having been received on the disposition of the collateral—the secured party's rights are not affected by the insolvency proceeding, nor should they be." Section 45.9 at page 1338.

*Spanogle, supra,* Footnote 2, at Page 392 in discussing inventory financing says, assuming that the financing statement covering the original collateral also covers the proceeds, "(p)roceeds include whatever is received when the collateral is sold as long as it is identifiable."

*Coogan, supra,* Footnote 2, also takes it for granted that security interest in receivables, which are "proceeds" of collateral previously subjected to a security interest, is automatic when a filing as to proceeds has previously been made. Section 15.08 [2] [b].

Such case law as we have been able to find confirms the conclusions which treatise authority assumed.

In Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc. (No. 3), reported in 25 Pa.Dist. & Co.R.2d 395 (Pa. 1958), the contest under Section 9–306 of the Code,[3] was between an inventory financer of automobiles (Bank) and the receiver of a car dealer (dealer) for the proceeds from sale of the original collateral (inventory, which we identify as first generation cars). Bank had perfected its security interest in the inventory (first generation cars) and its financing statement covered proceeds received on disposition of the collateral (first generation cars). Prior to insolvency dealer had sold first generation cars, deposited the proceeds in bank accounts, from which additional cars were purchased (which we identify as second generation cars) which second generation cars passed into receiver possession. It was held that Bank was entitled to the second generation cars provided it could trace the proceeds from the first generation cars into the second generation cars, since cash proceeds (from sale first generation cars) had been converted into noncash proceeds (second generation cars) in which Bank's security interest continued.

Dealer had also sold first generation cars receiving therefor used cars and installment sales contracts. It was held that Bank was entitled to the proceeds from the sale under Court Order of both the used cars and the installment sales contracts.

Dealer had exchanged a first generation car for a car ("X" generation) from another dealer. It was held that Bank was entitled to the proceeds from the sale under Court Order of the "X" generation car.

There were other claims by Bank under 9–306 which are not relevant to our problem.

While *Lepley* is not from a Court of last resort, it was not carried higher and is treated by text writers and in later decisions involving 9–306, as a leading case. See Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726, [7, 8] 732 (1967); Universal C.I.T. Credit Corporation v. Prudential Investment Corporation, 101 R.I. 287, 222 A.2d 571, [1] 574 (1966).

The principles of *Lepley* applied to facts very much like the case at bar appear in

---

3. Adopted in Pennsylvania in 1953 and with provisions in Section 9–306 at the time of *Lepley* in all pertinent respects as ours.

Associates Discount Corporation v. Old Freeport Bank, 421 Pa. 609, 220 A.2d 621 (1966). Bank financed inventory for car Dealer under trust receipt security agreement. Dealer sold a car and as part of the proceeds of the sale Buyer executed a bailment lease security agreement (chattel paper) for a portion of the purchase price. Dealer sold the chattel paper to Discounter. The Court said [2–5] at page 623:

"Thus again the security interest of Bank was shifted, this time to the proceeds of the sale of the chattel paper to Discounter."

Contest arose between Bank and Discounter over the proceeds from the sale of the chattel paper, and Discounter prevailed,—but under 9–308 (purchaser for new value). But for the 9–308 phase of the case, the conclusion is justified that Bank's security interest would have reached the proceeds from the sale of the chattel paper.

See also Chrysler Credit Corporation v. Sharp et al., 56 Misc.2d 261, 288 N.Y.S. 2d 525 (Supreme Court 1968) which turns upon a 9–308 situation.

Bogus, Trustee v. The American National Bank of Cheyenne, Wyoming, 401 F.2d 458 (10 CCA 1968) is of interest. Here the contest was between trustee in bankruptcy of debtor and Bank with a perfected security interest in debtor's liquor license, bar supplies and equipment dating from January 11, 1965. Later, finances pressing, debtor on May 4, 1966 assigned to Bank his entire business, for Bank to sell and apply proceeds to the Security Agreement. Bank did so on June 6, 1966 and within four months thereafter debtor entered bankruptcy. Trustee in bankruptcy claimed the assignment as a preferential transfer. It was held that Bank's security interest attached to the proceeds of the sale under Wyoming 9–306. See also Howarth v. Universal C.I.T. Credit Corporation, 203 F.Supp. 279 (D.C.Pa.1962).

Assuming momentarily no assignment to Bank, both treatise declaration and case law support the conclusion that if Keyes had paid Merrill either in cash (cash proceeds) which was not commingled or deposited in a bank account (9–306(4) (b) supra) or by check (cash proceeds) which had not been deposited in a bank account (9–306(4) (c) supra), prior to Merrill's insolvency proceedings, Bank would have been entitled to the cash or the check. It is equally clear that had Keyes paid Receiver, Bank would have been entitled to the fund, if identifiable. The assignment to Bank does not change the result.

We find nothing to support Receiver's contention that the words "whatever is received" in line one of 9–306(1) means "whatever is received by debtor." Paragraph (1) does not impose that limitation and the fact that paragraph (2) expressly includes collections received by debtor, argues that the proceeds in paragraph (1) has an independent meaning broad enough to include receipts by a receiver, as in *Lepley*. We are satisfied that paragraph (1) is to be read: " 'Proceeds' include whatever is received by anyone * * *."

Both treatise and case law support the conclusion that the identifiable noncash proceeds (contract right) from the sale of the collateral were subject to Bank's security interest and the proceeds (cash or check from Keyes) from this noncash proceeds are likewise subject to Bank's security interest.

Bank is entitled to the payment for the dryer from Keyes and the case is remanded to the Superior Court for consideration of interest charges, if any, in accordance with the reservation of the single Justice.

Appeal denied.

POMEROY, J., did not sit.