Argued May 7, affirmed September 10, petition for
rehearing denied October 9, 1973

# BAKER PRODUCTION CREDIT ASSOCIATION, Respondent, v. LONG CREEK MEAT COMPANY, INC. ET AL, Defendants, and FIRST STATE BANK OF OREGON, Appellant.

513 P2d 1129

*J. W. Rosacker* of McCarty & Rosacker, Portland, argued the cause and filed briefs for appellant.

*David C. Silven* of Banta, Silven, Young & Marlette, Baker, argued the cause and filed a brief for respondent.

McALLISTER, J.

This is an action for conversion of collateral, and proceeds of collateral, in which plaintiff claims an interest by virtue of a security agreement. The collateral consisted of livestock which had been owned by Deer Creek Cattle Feeders ("Cattle Feeders"), a partnership. The defendants in this action are Long Creek Meat Company ("Meat Company"), a corporation which purchased Cattle Feeders' cattle for slaughter, Coast Packing Company, a corporation which purchased carcasses from Meat Company, and the First State Bank of Oregon, which extended credit to Meat Company. The case was tried to the court without a jury, and resulted in a judgment for plaintiff against Meat Company and the Bank; Coast Packing was held not liable. The Bank appeals. Although the only issues on appeal involve the liability of the Bank, it is necessary to an understanding of those issues to describe the dealings among the various parties in some detail.

Cattle Feeders was engaged in the business of buying cattle, feeding and fattening them, and selling them for slaughter. Its operations were financed by plaintiff Baker Production Credit Association ("Baker PCA"). In return for loans and future advances, Baker PCA obtained a security agreement from Cattle Feeders covering, among other things, all livestock

owned or thereafter acquired by Cattle Feeders, all products of those livestock, and all proceeds from the sale of such livestock. The security agreement provided that the debtor was not to sell or otherwise dispose of any of the collateral without the consent of the secured party. Financing statements were filed in various counties and there is no contention on appeal that Baker PCA's security interest in Cattle Feeders' livestock was not properly perfected.

Cattle Feeders sold cattle to Meat Company, a corporation in which the partners of Cattle Feeders were officers. Meat Company, which was financed by defendant Bank, would pay for Cattle Feeders' cattle by issuing a draft payable to Baker PCA through defendant Bank. The parties' custom, for approximately six months prior to the events here in issue, was that the draft would be made out and mailed to Baker PCA at or about the time the cattle left the feed lot for delivery to Meat Company's plant. The drafts were made out and signed by S. C. Holmes, who was vice-president of Meat Company and a partner in Cattle Feeders. These drafts would be sent to Baker PCA and then transmitted to defendant Bank through normal banking channels and, as part of Bank's financing arrangement with Meat Company, would be paid and the drafts themselves held as evidence of Meat Company's indebtedness to Bank.

The Meat Company would slaughter the cattle and sell the carcasses to Coast Packing under a contract providing that Coast Packing would, with certain limitations, purchase Meat Company's entire output. Meat Company assigned its rights under this contract to defendant Bank and Coast Packing paid for its purchases from Meat Company by checks payable to defendant Bank. These checks were applied by the

Bank to Meat Company's indebtedness, retiring first the oldest Meat Company drafts which had been accepted and paid by the Bank.

In October 1969 the Bank discussed with Mr. Troutman, president of Meat Company (and also a partner in Cattle Feeders), the fact that Meat Company's drafts had exceeded the agreed line of credit and, at Troutman's request, Meat Company was given 60 days to reduce its outstanding indebtedness to the agreed amount. This had not been done by January 29, 1970, and on that date defendant Bank notified Mr. Troutman that no more Meat Company drafts would be accepted and paid by the Bank. Thereafter, eight Meat Company drafts, totaling $88,343.96, payable to Baker PCA for purchase of Cattle Feeders' cattle were dishonored by the Bank.

On and after January 29, the Bank continued to receive checks from Coast Packing in payment for carcasses purchased from Meat Company, but applied these checks to Meat Company's indebtedness without continuing to honor its drafts. The issue is whether the Bank, in this way, converted collateral or proceeds in violation of Baker PCA's security interest.

ORS 79.3060 provides:

"(1) 'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. * * *

"(2) Except where ORS 79.1010 to 79.5070 otherwise provide, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

Certain purchasers of the collateral take free of a perfected security interest under ORS 79.3070 (1) which provides:

"(1) A buyer in ordinary course of business as defined in subsection (9) of ORS 71.2010, *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (Emphasis added.)

"Farm products" are defined by ORS 79.1090:

"Goods are:

* * * * *

"(3) 'Farm products' if they are crops or livestock or supplies used or produced in farming operations * * * and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory."

Under ORS 79.1090 (3) it is clear that Cattle Feeders was engaged in "farming operations" and that the cattle were "farm products." The trial court, in its memorandum opinion, so found. Therefore, under ORS 79.3070 (1), a sale to a buyer in the ordinary course of business would not cut off Baker PCA's security interest in the cattle. The Code, as to farm products, allows the security interest to follow the collateral through a succession of purchases. See *Garden City Production Credit Assn. v. Lannan,* 186 Neb 668, 186 NW2d 99 (1971). Although after slaughtering by Meat Company the cattle were no longer "farm products" but "inventory" (see ORS 79.1090 (4)), a purchaser from Meat Company would not take free of Baker PCA's security interest because it was not one "created by his seller" as specified in

ORS 79.3070 (1). See *United States v. Hext,* 444 F2d 804, 814 (5th Cir 1971); Hawkland, The Proposed Amendment to Article 9 of the U.C.C.—Part 1: Financing the Farmer, 76 Comm. L. J. 416, 418 (1971).①
Baker PCA's security interest, therefore, continued to cover the carcasses in the hands of Coast Packing. *Evans Products v. Jorgensen,* 245 Or 362, 421 P2d 978 (1966), cited by defendant Bank, did not involve farm products and is not in point.

■■ Baker PCA's security interest also covered the "proceeds" of those carcasses. "Proceeds," as defined in ORS 79.3060 (1), includes "whatever is received when collateral * * * is sold," and subsection (2) provides that the security interest continues in any identifiable proceeds. Under these provisions, the Coast Packing checks which were received by the Bank were "proceeds" subject to Baker PCA's security interest, even though they were paid to the Bank rather than to the seller or to the debtor. See *Farnum v. C. J. Merrill, Inc.,* 264 A2d 150, 156 (Me 1970):

> "We find nothing to support Receiver's contention that the words 'whatever is received' in line one of 9-306 (1) means 'whatever is received by debtor.' Paragraph (1) does not impose that limitation and the fact that paragraph (2) expressly includes collections received by debtor, argues that the proceeds in paragraph (1) has an independent meaning broad enough to include receipts by a receiver * * *. We are satisfied that paragraph (1) is to be read: ' "Proceeds" include whatever is received by anyone * * *.' "

---

① The 1973 Legislature amended ORS 79.3060 (2) to conform to recent changes in the Official Text of the Uniform Commercial Code. SB 143, § 18. By deleting from that section the words "by the debtor", the legislature has made it clear that a security interest survives a sale or disposition of the collateral by any person, unless the disposition is authorized by the secured party.

Therefore, unless some other exception applies, the checks received by the Bank from Coast Packing were proceeds which were subject to Baker PCA's security interest.

■■ The Bank contends that the trial court erred in finding for Baker PCA and against the Bank. We have indicated our disapproval of such "broadside" assignments of error in actions at law. *Quillin v. Peloquin*, 237 Or 343, 345, 391 P2d 603 (1964). The Bank's assignments raise, at most, the question whether the trial court was required as a matter of law to decide the case in its favor. We do not retry the facts. *Hekker v. Sabre Const. Co.*, 265 Or 552, 510 P2d 347 (1973).

■ The Bank first argues that Baker PCA consented to the sale of the cattle by Cattle Feeders, and thereby waived its security interest and any right to complain of a conversion of the collateral or proceeds by other parties. The evidence is clear and undisputed that Baker PCA was aware that Cattle Feeders was selling cattle to Meat Company and had no objection to those sales. Under ORS 79.3060 (2) a sale by the debtor cuts off a security interest in the collateral if the secured party authorized the debtor's actions "in the security agreement or otherwise." The security agreement in this case provides that the collateral will not be sold without the secured party's consent. The trial court found, in its memorandum opinion, that Baker PCA consented to the sale of cattle in return for Meat Company's drafts on the condition that the drafts were honored and paid. This is a finding of fact and, if supported by the evidence, is binding on appeal in an action at law.

We find that support in the testimony that Baker PCA had consented to sales by Cattle Feeders on condition that payment was received when the cattle

left the feed lot for delivery to Meat Company, and in the evidence of the parties' practice prior to January 29. The Bank points out that payment was routinely made by draft, and that Baker PCA made no objection. Until the Bank refused to honor the drafts which are the subject of this litigation, the drafts had always been honored and paid and there had been no occasion to object.

Defendant Bank relies on *Swift & Co. v. Jamestown National Bank,* 426 F2d 1099 (8th Cir 1970) and *Clovis National Bank v. Thomas,* 77 NM 554, 425 P2d 726 (1967) in support of its argument that Baker PCA, by consenting to the sales, waived its security interest. The *Swift & Co.* case is not in point as the security agreement in that case expressly authorized sales in the ordinary course of business, and the secured party testified that the debtor had "blanket permission" to sell, 426 F2d 1099. In the present case the security agreement provides that the cattle will not be sold without the secured party's consent. The issue is whether Baker PCA's consent was on condition that the draft be honored and paid.

In *Clovis* the security agreement provided that the collateral, cattle, would not be sold without the secured party's prior written consent. Without the secured party's knowledge or consent, the debtor sold the cattle through a commission agent and failed to remit the proceeds. The secured party brought an action for conversion against the commission agent, but it was held that the action could not prevail because the secured party had been aware of prior sales made by the debtor without written permission, and had received the proceeds of those sales without objection. It had, the court held, thus waived its right to insist that the debtor obtain written permission to sell.

*Clovis* is a controversial decision. The majority ignored UCC 1-205 (4) which provides:

> "The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

The case attracted critical comment (see Comment, 8 Nat Res J 183 (1968); Comment, 20 Baylor L Rev 136 (1967)) and resulted in an amendment by the New Mexico legislature to UCC 9-306 (2) providing:

> "* * * A security interest in farm products and the proceeds thereof shall not be considered waived by the secured party by any course of dealing between the parties or by any trade usage." 8 NM Stat. Anno, 1971 Supp, § 50 A-9-306.

See discussion in *Hawkland,* supra, 76 Comm L J at 419. See, also, Sorelle, Farm Products Under the U.C.C.—Is A Special Classification Desirable? 47 Tex L Rev 309 (1968); Comment, 12 Ariz L Rev 391 (1970). Subsequent cases in other jurisdictions have found no waiver of the farm products security interest under varying facts. See *Vermilion County Production Credit Ass'n v. Izzard,* 111 Ill App 2d 190, 249 NE2d 352 (1969) (court rejected arguments of consent to sale based on provisions of security agreement that the secured party's interest would attach to after-acquired property and to proceeds, and of waiver based on unspecified usage of trade); *Garden City Production Credit Ass'n. v. Lannan,* supra (secured party was aware of prior sales and had accepted proceeds without objection or rebuke). See, also, *United States v. Greenwich Mill & Elevator Company,* 291 FS 609 (ND Ohio

1968) (secured party had told an unsecured creditor, to whom the debtor later transferred part of the collateral, that he would be paid from the proceeds of the debtor's farming operations). There is nothing in these cases to convince us that the trial court was wrong as a matter of law in its findings as to the conditions of Baker PCA's consent to the sales by Cattle Feeders.

 If the consent or authorization to sell is unconditional, as in *Swift & Co. v. Jamestown National Bank*, supra, then clearly the purchaser takes free of the security interest. We have found no cases decided under the Code which deal with conditional consents.[2] There is nothing in the Code, however, to prevent a secured party from attaching conditions or limitations to its consent to sales of collateral by a debtor. If such conditions are imposed, then a sale by the debtor in violation of those conditions is an unauthorized sale and the security interest, under ORS 79.3060 (2), continues in the collateral.

The purchaser, of course, can protect himself by ascertaining whether a security interest exists and by requiring that he be furnished with proof of the secured party's consent. In this way he can learn whether there are any conditions attached to the consent which could prevent him from taking free of the security interest.

 The trial court found as a fact that both Meat Company and defendant Bank, its assignee, knew that Baker PCA had consented to the sales on condition that the Meat Company drafts were paid. Although

---

[2] The doctrine of conditional consent was recognized in the pre-Code law of chattel mortgages. See Arnold v. First Nat'l Bank, 96 Colo 104, 39 P2d 791, 97 ALR 643 (1934).

the record contains no express admission of such knowledge by Bank, the trial court's finding is warranted by the evidence of the parties' course of dealing over a six months' period. When defendant Bank failed to pay the drafts, the conditions of the consent were not met. The security interest was not lost.

■ Defendant Bank also argues that, even if Baker PCA did not waive its security interest by consenting to Cattle Feeders' sales of cattle, nevertheless there was no conversion under the rule of *United States v. Hext,* supra, 444 F2d 804. In that case the court held that purchasers of cotton, in the ordinary course of business, took the cotton free of a security interest in the cotton crop because the cotton farmer, as was known by the secured party, was the sole owner of a corporation which ginned and marketed the farmer's cotton. The court reasoned as follows:

"* * * the fact that mortgaged cotton is sold by a farmer-debtor to a gin and then by the gin in the ordinary course of business to a buyer, does not, in the normal transaction, extinguish the security interest. But in the instant case Hext, the farmer who created the security interest, was the sole owner of the Gin Co. which sold the cotton to the buyer, *and this state of affairs was known to the secured party at the time the security interest was created.*

"We think this situation is directly analogous to one where a secured party takes a security interest in goods purchased by the debtor as consumer goods or equipment, knowing the debtor to be in the business of selling goods of that kind, and the debtor then puts the goods in his inventory and sells them to a buyer in ordinary course. Professor Gilmore has suggested that in such a situation the buyer should take free of the security interest under the provisions of Section 9-307 (1). We agree. In the instant case, the FHA took a security interest in

goods (the 578 bales of cotton) as farm products, knowing that the debtor had the capability of transferring them into the category of inventory and selling them in the ordinary course of his gin business. * * *" 444 F2d at 814.

Defendant Bank argues that the present case is similar to *Hext* because the partners in Cattle Feeders were officers and stockholders in Meat Company, and that the two entities ought to be considered as one for this purpose.

In *Hext* the debtor, through his ginning company, marketed his cotton but did not remit the proceeds of the cotton as it was sold. Instead, he simply retained the proceeds in the ginning company's bank account and, at the end of the season, the ginning company did not have enough to pay off the debt. In the present case Meat Company was not operated as the alter ego of Cattle Feeders. Funds were not commingled or misused; rather, each transaction was immediately accounted for and drafts were drawn payable to Baker PCA upon each sale by Cattle Feeders. Baker PCA, knowing this, should not be charged with having put its debtor in a position to dispose of the collateral without a proper accounting when in fact its debtor had never done so in the past. The Code's provisions on security interests in farm products prefer the secured party over the buyer in the ordinary course of business except where the secured party waives his interest by authorizing actions by the debtor which are inconsistent with the existence of that interest. Where, as here, the secured party has every reason to believe that its security interest will be recognized and protected by both its debtor and the purchaser from the debtor, there is no reason to hold that the security interest has been extinguished.

■ Defendant Bank next argues that Baker PCA failed to prove any debt was due from Cattle Feeders at the time in question. Baker PCA introduced demand notes executed by the partnership totaling over $1,750,000 and the assistant manager testified that on January 29, 1970, the unpaid principal balance was $835,080.06, and that at the date of trial $285,544.99 remained unpaid. This evidence is sufficient to support the trial court's judgment.

The trial court overruled defendant Bank's demurrer to the complaint. Bank assigns this ruling as error, contending that the complaint does not state a cause of action against the Bank. The complaint alleges Baker PCA's loan to Cattle Feeders, its security agreement covering Cattle Feeders' livestock, and the filing of the financing statements. It also alleges that approximately 303 head of cattle subject to the security agreement were sold to Meat Company and that the cattle were paid for by drafts payable through defendant Bank. The complaint then alleges:

"That by pre-arrangement among the defendants, the exact nature, time and extent of which is unknown to the plaintiff, said defendants had agreed that all of the livestock of said Deer Creek Cattle Feeders would be slaughtered by the defendant Long Creek Meat Company, Inc., and the carcasses delivered to the defendant Coast Packing Company in Grant County, Oregon; that the defendant Coast Packing Company would pay therefor by delivery of funds to said First State Bank of Oregon, and/or by making arrangements with the defendant First State Bank of Oregon, for the extension of credit to the defendant Long Creek Meat Company, Inc.; that pursuant to said arrangement, the defendant Long Creek Meat Company, Inc., authorized said drafts; that said drafts were duly presented to the defendant First State

Bank of Oregon, and by said Bank held and ultimately dishonored, and the same remain unpaid;
\* \* \*."

The complaint further alleges that Cattle Feeders' indebtedness exceeded the total of the unpaid drafts, that the cattle and its proceeds were collateral under Baker PCA's security agreement, that Cattle Feeders was in default on its debt, and that Baker PCA was entitled to possession of the collateral and proceeds, but that

"\* \* \* said defendants have failed, refused and neglected to deliver to the plaintiff, said collateral and/or products and/or proceeds, and said defendants have converted the same to their own use all contrary to the understanding and agreement among the defendants relative to disposition of said proceeds and in violation of the rights of the plaintiff therein and thereto."

Where a defendant answers after his demurrer to the complaint has been overruled, the complaint will be construed most favorably to the plaintiff. *Gibson v. Gibson,* 180 Or 691, 697, 178 P2d 702 (1947) ; *Jensen v. Rosumny,* 153 Or 111, 113-114, 54 P2d 307 (1936) ; *Thompson Optical Institute v. Thompson,* 119 Or 252, 262, 237 P 965 (1925) ; *Shaw Wholesale Co. v. Hackbarth,* 102 Or 80, 89-90, 198 P 908, 201 P 1066 (1921) (rev'd on rehearing on other grounds). The complaint in this case adequately alleges that Baker PCA had a perfected security interest in Cattle Feeders' cattle, which were sold to and slaughtered by Meat Company and that when the cattle were delivered to Meat Company, drafts were drawn on Meat Company payable to Baker PCA through defendant Bank. It also alleges that the drafts were presented to the Bank, which held and dishonored them. The complaint also alleges that

the defendants had agreed among themselves that after slaughter by Meat Company, the carcasses would be delivered to Coast Packing, and Coast Packing would pay by either delivering funds to the Bank or by arranging for the Bank to extend credit to Meat Company and that Meat Company drafts were issued pursuant to this agreement.

If this complaint is defective in stating a cause of action against the Bank, it is because it fails to directly allege that Coast Packing did, as agreed, pay for the carcasses by delivering funds to the Bank. We think that when the complaint is liberally construed, this fact may be inferred from the allegations regarding the agreement among the defendants, and from the allegation that the defendants refused to deliver the collateral, including the carcasses, and the proceeds.

But even if the complaint is insufficient in this particular, defendant Bank cannot complain at this juncture. After its demurrer was overruled it filed an answer in which it alleged that it received checks from Coast Packing, "pursuant to an agreement between defendant Coast Packing Company and defendant Long Creek Meat Company, and an assignment thereunder to this defendant; and, by virtue of agreement with defendant Long Creek Meat Company." Plaintiff did not deny this allegation in its reply. A deficiency in the complaint may be cured by an allegation in the answer, if that allegation is not denied by the plaintiff, and this rule has been applied although the answer is filed after a demurrer to the complaint has been overruled. *Igo v. Butler,* 199 Or 423, 428, 262 P2d 675 (1953); *Compton v. Perkins,* 144 Or 346, 357, 24 P2d 670 (1933); *Lauderback v. Multnomah*

*County,* 111 Or 681, 687-688, 226 P 697 (1924). Taken together, the pleadings adequately allege that defendant Bank received funds from Coast Packing, which funds represented proceeds of carcasses covered by Baker PCA's security agreement and, having received these funds, refused to honor Meat Company's drafts to pay for Cattle Feeders' livestock.

As we find no error, the judgment of the trial court is affirmed.