**PRODUCTION CREDIT ASSOCIATION OF MINOT, North Dakota, Plaintiff and Appellee,**

v.

**Dorland MELLAND, Defendant,**

and

**Daniel R. Delaney and Ray Grain Corporation, Defendants and Appellants.**

**Civ. No. 9560.**

Supreme Court of North Dakota.

May 9, 1979.

Pringle & Herigstad, Minot, for plaintiff and appellee; argued by Herbert L. Meschke, Minot.

John H. MacMaster, Williston, for defendant Dorland Melland; no appearance.

Bjella, Neff, Rathert, & Wahl, Williston, for defendants and appellants; argued by James R. Carlson, Jr., Williston.

ERICKSTAD, Chief Justice.

This case involves the priority of competing claims between Production Credit Association and Daniel R. Delaney to the proceeds of Dorland Melland's 1976 grain crop. Both parties loaned money to Melland that was allegedly secured by the crop and Melland subsequently defaulted on the loans. The district court held that Production Credit Association was entitled to the identifiable proceeds of the crop in the possession of Delaney and Ray Grain Corporation, a wholly-owned corporation of Delaney, and they appeal. We affirm the district court judgment.

Dorland Melland (hereinafter Melland) farmed 2,000 acres of rented land in Williams County. In order to finance his farming operation, Melland borrowed money from, among others, Daniel Delaney (hereinafter Delaney), Ray Grain Corporation, and Production Credit Association (hereinafter PCA). He also purchased supplies on

credit from Ray Farmers Union Oil Company.

On December 13, 1975, Melland and Delaney entered into two contracts for future delivery of grain [1] from Melland's 1976 crop and on the same date, Ray Grain Corpora- tion advanced Melland $52,000. Contemporaneously, Delaney entered into an agreement with Melland that provided in part that Melland would give Delaney an undivided three-fourths ($\frac{3}{4}$) share of his 1976 crop in exchange for the financing provided by Delaney.[2] Delaney did not file a financ-

1. The contracts were for 15,000 bushels of durum and 12,000 bushels of wheat. The form of the grain sale contract was as follows:

"CONTRACT FOR FUTURE
DELIVERY OF GRAIN

"The seller agrees to sell and the buyer agrees to buy this <u>13th</u> day of <u>Dec.,</u> 1975 the following grain to be delivered to buyer's elevator as indicated:

"Grain & Grade <u>Durum— # 1 Hard Amber,</u>

"Prem./Disc. <u>Market  *  *  *  on day sold</u>

"Market discounts and premiums at time of delivery to apply, unless otherwise specified. Any increase or decrease in Buyer's freight rates before delivery date to be for seller's account.

"Net Bushels <u>15,000—$\frac{3}{4}$ Dan $\frac{1}{4}$ Dorland</u>

| "Price Per Bushel | <u>Market price on day sold but must be sold on or before December 17, 1976</u> |
| --- | --- |
| "Delivery Date(s) | <u>as soon as harvested but not later than Sept. 30, 1976</u> |

"Seller warrants that said grain will be delivered to buyer free and clear of all liens and encumbrances except <u>none</u>

"If buyer is unable to receive the grain at the time specified for reasons beyond his control such as, but not limited to, lack of transportation, equipment failure, etc., seller shall still be obligated to deliver the grain at such time as buyer's condition eventually permits.

"Settlement for under-delivery or non-delivery of grain shall be made on the difference between market price on delivery date and the contract price plus <u>10</u> cents per bushel handling charge to be paid to buyer upon such settlement." [underlined material handwritten]

The contracts did not describe the land upon which the grain was to be grown, nor was there a price specified. The parties also entered into a third contract for future delivery of grain on June 21, 1976, for an additional 1,000 bushels of durum.

2. The agreement provided in relevant part:

"AGREEMENT

"THIS AGREEMENT, Made and entered into this 19th day of December, 1975, by and between DORLAND MELLAND, of Ray, North Dakota, and DANIEL R. DELANEY, of Ray, North Dakota.

"WITNESSETH:

"WHEREAS, the parties hereto did on or about the 18th day of December, 1975, enter into a certain Security Agreement wherein it was agreed, in order to secure monies, that Dorland Melland and Celestine R. Melland would pay their rent on the farm land leased by them, and would use the money secured to hire labor and pay any and all other farming expenses that should arise out of the farming operation of Dorland Melland and Celestine R. Melland for the crop year of 1976, and

"WHEREAS, the parties hereto desire to further secure the promissory note executed by said Dorland Melland and Celestine R. Melland, and made payable to Daniel R. Delaney,

"NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS, AGREEMENTS AND STIPULATIONS HEREIN CONTAINED, the parties do hereby agree as follows:

"This Agreement covers the land leased by Dorland Melland and Celestine R. Melland, located in the County of Williams, and State of North Dakota, and described as follows:

*    *    *    *    *    *

"Dorland Melland does hereby agree to give Daniel R. Delaney an undivided three-fourths ($\frac{3}{4}$) share of his said 1976 crop, the grain from said crop to be delivered to the elevator of Ray Grain Corporation at Ray, North Dakota. The grain from said crop shall be divided at the time of delivery, free and clear of all encumbrances. This undivided three-fourths ($\frac{3}{4}$) share of said crop shall not include in any way the amount owed from that certain Seed Lien dated 17th of June, 1975, said Seed Lien having been for seed furnished for the crop year of 1975.

"The parties hereto do further agree that if said Dorland Melland should required [sic] additional seed for the crop year 1976, an additional Seed Lien will be placed of record at a future time when the amount of seed to be furnished shall be determined. This Seed Lien shall not be determined to be payment of any part of the three-fourths ($\frac{3}{4}$) share given to Daniel R. Delaney by Dorland Melland under this Agreement. It is expressly agreed by and between the parties hereto that Dorland Melland shall pay for any and all seed covered by said Seed Liens out of his one-fourth ($\frac{1}{4}$) share of the crop for 1976.

"Dorland Melland acknowledges the fact that without this financing from Daniel R. Delaney that he would not possibly be able to furnish the money to secure these lands hereinabove described and pay expenses for the farming operation for the year 1976.

ing statement on these transactions. Delaney did file a financing statement, however, on some of Melland's farm machinery and equipment for which he held a security agreement. Delaney also filed a seed lien against Melland in the spring of 1976 and Ray Grain Corporation supplied Melland with seed in the amount of $8,233.05. Priority of this seed lien is conceded by PCA.

Subsequent to the Melland-Delaney transactions, PCA made a series of four loans to Melland totaling $46,607. Three of the loans were "supply loans" in which PCA paid the money directly to Ray Farmers Union Oil Company (hereinafter Farmers Union) who credited Melland's account. These loans were made pursuant to standard procedure and were used to pay a producer's oil, gas, and other supplies that he obtained from local suppliers. In order to facilitate the making of these supply loans to Farmers Union customers, Farmers Union guaranteed the loans. The fourth loan from PCA to Melland was for crop insurance.[3] As security for these loans, PCA entered into a security agreement with Melland on his 1976 crop that showed no prior mortgages and it also filed a financing statement with the Register of Deeds in Williams County on March 29, 1976. The district court found as an undisputed fact that the filing was valid:

"3. As security for the foregoing indebtedness of Defendant Dorland Melland, Production Credit Association of Minot held a valid security agreement on all crops within one year of the date thereof, March 25, 1976, of Dorland Melland, which was duly perfected by filing of a financing statement in the office of the Register of Deeds of Williams County on March 29, 1976 as Document No. 17421, which was the county of residence of Dorland Melland and the county where the real estate was located on which the crops were to be grown;"

"It is expressly understood and agreed by and between the parties hereto that Daniel R. Delaney will not be held liable for any or all of Dorland Melland's and Celestine R. Melland's liabilities during the crop year 1976."

Melland delivered all of his 1976 crop to Ray Grain Corporation during harvest of 1976 apparently pursuant to their agreement and the grain was ultimately sold to Ray Grain Corporation for $64,927.32. None of this amount was paid to Melland as Delaney claimed all of the proceeds for Melland's indebtedness to Ray Grain Corporation and himself.

Melland subsequently defaulted on his obligations to PCA without making any payments and PCA brought this suit against Melland, Delaney, and Ray Grain Corporation, for $49,672.40 plus interest. After commencement of the suit, Melland was discharged in bankruptcy. Farmers Union did not pay PCA on its guarantee and it is now also bankrupt.

After deducting the amount for Delaney's 1976 seed lien, the remaining balance held by Ray Grain Corporation and Delaney is $56,694.27.

Where should the balance of the proceeds from Melland's 1976 crop be applied? Should it be applied on Melland's debt of $49,672.40 plus interest to PCA, or on Melland's remaining debt, following foreclosure on other property that was secured by a security agreement, of over $92,000 to Ray Grain Corporation and Delaney?

The district court made the following relevant conclusions of law, all of which are in essence challenged on this appeal:

"2. The unrecorded and unfiled 'Agreement,' dated December 19, 1975, between Dorland Melland and Daniel R. Delaney is a crop mortgage to an individual which is not valid under N.D.C.C. § 35–05–01;

"3. As a transfer of growing crops, the 'Agreement,' dated December 19, 1975, between Defendant Dorland Melland and Defendant Daniel R. Delaney would also be void under N.D.C.C. § 35–05–03;

3. Dorland Melland signed promissory notes for each loan. The loans were made at the following times and amounts:

| | | |
|---|---|---|
| March 22, 1976 | $20,121 | (supply loan) |
| April 26, 1976 | 10,054 | (supply loan) |
| June 10, 1976 | 10,000 | (supply loan) |
| June 10, 1976 | 6,432 | (crop insurance) |
| Total | $46,607 | |

"4. Under N.D.C.C. Chapter 41–02, the 'Agreement' could not be an effective 'sale' of growing crops, since title did not pass prior to Plaintiff's perfected security agreement in the crops because there was no identification of the crops for passing of title prior to Plaintiff's perfected security agreement, under N.D.C.C. § 41–02–05, § 41–02–06, § 41–02–46, and § 41–02–49.

"5. Under N.D.C.C. Ch. 41–09, the 'Agreement' dated December 19, 1975, between Defendant Dorland Melland and Defendant Daniel R. Delaney is not a perfected security interest and is therefore not entitled to priority over Plaintiff's perfected security interest;

"6. 'Good faith' of Plaintiff is not an issue in this case since: (1) there was no contract between Plaintiff, on the one hand, and Defendants Delaney and Ray Grain Corporation, on the other hand; and, (2) in obtaining its crop mortgage from Defendant Melland, Plaintiff was a disinterested creditor attempting to protect its own commercial interest; and, (3) Plaintiff was not in pari delicto with the mortgagor, Defendant Dorland Melland in his dealings with Defendant Delaney;

"7. Plaintiff's perfected security agreement on the crop of Dorland Melland is entitled to priority over the unperfected 'Agreement,' dated December 19, 1975, between Dorland Melland and Defendant Daniel R. Delaney; N.D.C.C. § 41–09–33, subsection 5.

"8. There are no affirmative defenses or issues of fact which would entitle Defendants Delaney or Ray Grain Corporation to trial by jury in this foreclosure action against proceeds;

"9. Under Chapter 41–09, Plaintiff's security agreement is effective against purchasers of the collateral (N.D.C.C. § 41–09–14) and plaintiff's security interest continued in the collateral notwithstanding its sale and also continued in the identifiable proceeds which were not paid to the debtor Dorland Melland (N.D.C.C. § 41–09–27)."

This appeal by Delaney and Ray Grain Corporation raises issues of priority of security interests in crops, of the sale of crops before they are planted, of whether or not Delaney was properly denied a jury trial, and of enforcement of a security interest against a purchaser of the collateral.

Although Delaney advanced money to Melland prior to PCA's loan, it is undisputed that Delaney did not perfect his interest pursuant to Chapter 41–09, N.D.C.C. (Article 9 U.C.C.); therefore, PCA has priority pursuant to Section 41–09–33, N.D.C.C. (§ 9–312 U.C.C.). Delaney argues, however, that PCA should not be allowed to assert its "technical priority" because it knew of Delaney's prior financing arrangements with Melland and it exhibited a lack of good faith. This argument is premised on the theory that Section 41–01–13, N.D.C.C. (§ 1–203 U.C.C.), imposed an obligation of good faith on PCA in its dealings with Delaney. Section 41–01–13, N.D.C.C., provides:

"41–01–13. (1–203) *Obligation of good faith.*—Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."

PCA responds that Section 41–01–13, N.D.C.C., is inapplicable to its dealings with Delaney because there was no contract between PCA and Delaney and that PCA was merely acting as a disinterested creditor attempting to protect its own commercial interest.

In *In re Smith,* 326 F.Supp. 1311 (D.Minn. 1971), a Federal district court in Minnesota dealt with a similar issue. In *Smith,* the debtor purchased an automobile in April, 1969, from a car dealer and he executed a conditional sales contract that was assigned by the seller to a bank (first lender). Neither the seller nor the assignee filed a financing statement evidencing the security interest. In July, 1969, a credit company (second lender) lent the debtor money that was secured by the same automobile. The second lender subsequently perfected its interest by filing a financing statement with the county register of deeds. At the time of this transaction, the second lender had actual knowledge of the unperfected security interest of the first lender in the automobile. The Federal district court summarized the situation:

"The situation presented is one involving conflicting security interests in the same collateral. Community Credit holds a security interest perfected by filing. The Bank's interest is prior in time but is unperfected either by filing or possession. It is conceded by all parties that Community Credit as holder of the perfected security interest would prevail if it had not had actual knowledge of the Bank's prior unperfected interest. Hence the issue raised before the Referee in Bankruptcy and which now faces this Court is whether actual knowledge on the part of Community Credit of the Bank's prior interest prevents it from achieving priority which would have otherwise been obtained by being the first to file. The Referee answered this question in the affirmative and gave priority to the Bank's lien." 326 F.Supp. at 1312.

The Federal court held that the second lender's knowledge of the prior security interest did not alter its priority under the Code. In so holding, the court noted that the majority of cases and commentators that had considered the issue agreed that "knowledge could be disregarded in the operation of Section 9–312(5)." *See e. g. First National Bank and Trust Company of Vinita, Okl. v. Atlas Credit Corp.,* 417 F.2d 1081, at 1082, fn. 1, 1083 (10th Cir. 1969); *In re Gunderson,* 4 U.C.C.Rep. 358, 358–59 (D.C. Ill.1967); *Bloom v. Hilty,* 427 Pa. 463, 234 A.2d 860 (1967); Felsenfeld, Knowledge as A Factor in Determining Priorities Under the Uniform Commercial Code, 42 N.Y.U.L. Rev. 246, 248–50 (1967). *See also* 3 Uniform Commercial Code (U.L.A.) § 9–312 and 1972 official comments.

Although Delaney agrees that PCA's knowledge of prior financing by Delaney and Ray Grain Corporation to Melland is alone insufficient to mitigate the "harshness of the Code's priority provisions," he argues that "good faith is something more than mere knowledge, and that something more is present in this case." This argument is apparently premised on the facts surrounding the relationship between PCA and Farmers Union in this case. In addition to guaranteeing the supply loans to producers, Farmers Union also allowed PCA to use its offices several times a week to conduct PCA business. In addition, the Farmers Union manager would oftentimes help borrowers when PCA personnel were not present. The facts also indicate that Delaney told the Farmers Union manager that he was financing Melland and "to help keep Melland's spending and expenses down." Delaney apparently argues that due to the unique relationship between PCA and Farmers Union, this knowledge by Farmers Union is imputed to PCA. Although Melland testified that he told both PCA and Farmers Union that he had given a crop mortgage to Delaney and Ray Grain Corporation, PCA's manager testified that he did not know of any crop mortgage by Melland to Delaney or Ray Grain Corporation until the harvest of 1976. The district court found that "at most, Plaintiff [PCA] had only generalized knowledge of some sort of 'financing arrangements' between Defendant Melland and Defendant Delaney," and that PCA did not owe any obligation of good faith to Delaney or Ray Grain Corporation.

In *In re Smith, supra,* the Federal district court apparently found knowledge and good faith to be synonymous:

"This provision [§ 9–312(5) U.C.C.] nowhere makes lack of knowledge (good faith) a requirement for obtaining priority. The statute on its face provides for a race to the filing office with actual knowledge of a prior unperfected security interest apparently being irrelevant if one perfects first by filing. . . .

"Under these circumstances this Court feels that the conclusion of the Referee in Bankruptcy that good faith should be read into . . . [§ 9–312(5) U.C.C.] is unwarranted." 326 F.Supp. at 1313–1314.

Even if we were to accept Delaney's argument that "good faith is something more than mere knowledge," there is nothing in this record to indicate any showing of bad faith. Indeed, the record does not even establish that PCA had actual knowledge of the prior security interest.

■ In support of his contention that a finding of bad faith will alter priorities under the Code, Delaney refers us to *General Ins. Co. of America v. Lowry*, 570 F.2d 120 (6th Cir. 1978) and *Thompson v. United States*, 408 F.2d 1075 (8th Cir. 1969). We have read those decisions and find them to be clearly distinguishable from this case. In both of those cases, more than a generalized knowledge of a prior unperfected security interest was involved. We hold that PCA is not barred from asserting its priority under Section 41–09–33, N.D.C.C. (§ 9–312 U.C.C.) because of its knowledge of a previous security interest or because of lack of good faith.

Delaney also argues that his transactions with Melland constituted a sale rather than a security interest; thus, Chapter 41–09, N.D.C.C. (Article 9 U.C.C.), is inapplicable. Section 41–01–11(37), N.D.C.C. (§ 1–201 U.C.C.) defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." Section 41–09–02, N.D.C.C. (§ 9–102 U.C.C.), provides that Chapter 41–09, N.D.C.C. (Article 9 U.C.C.) applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures." Thus the test of whether or not a transaction comes within Chapter 41–09, N.D.C.C. (Article 9 U.C.C.) is if the transaction is intended to have effect as security. The agreement between Delaney and Melland dated December 19, 1975, provided that "the parties hereto desire to further secure the promissory note executed by said Dorland Melland . . . and made payable to Daniel R. Delaney." Furthermore, in response to questions by counsel for PCA regarding the price of the alleged contracts for sale, Delaney admitted that the transactions were an attempt to secure the money borrowed by Melland:

"Q BY MR. MESCHKE: Would you please tell me what price the contracts provide for.

"A The prices provide for market price on the day sold, that we would sell it.

"Q Not December 13th, 1975?

"A No, because this crop had not yet been seeded. All I was doing here was

securing all of the monies that I would give to Mr. Melland to provide him and enable him to put the '76 crop in. If I would not have provided him with money to pay the cash rent, also furnish the seed for him, give him money to pay labor and other expenses, there is no way that this crop would have ever been seeded. He had exhausted all of his means of borrowing."

■ Thus, the language of the agreement as well as the surrounding circumstances indicate that the Delaney-Melland transactions were intended to have effect as security and that Chapter 41–09, N.D.C.C. (Article 9 U.C.C.), should apply.

PCA also argues that Delaney's sale theory is untenable because of the application of Chapter 35–05, N.D.C.C., regarding crop mortgages. Sections 35–05–01 and 35–05–03 are especially pertinent and provide as follows:

"35–05–01. *Security agreement prohibited—Exception.*—Security interests in growing and unharvested crops are prohibited, and any security agreement purporting to create a security interest therein shall be void. The provisions of this section shall not apply to any security interest or lien in favor of the United States, this state, any county, or any department or agency of any of them, including the Bank of North Dakota, nor to any banking institution as defined by section 6–01–02, nor to any other agricultural lending agency, nor to any security interest created by contract to secure money advanced or loaned for the purpose of paying government crop insurance premiums or to secure the purchase price or the rental or improvement of the land upon which the crops covered by the contract are to be grown."

"35–05–03. *Bills of sale and transfers circumventing crop mortgage law prohibited—Presumption—Penalty.*—No person shall solicit or procure bills of sale or transfers of whatever nature for the purpose of obtaining title to or liens upon growing crops in circumvention of section 35-05-01, and any such bill of sale or

transfer shall be void. Any such bill of sale or transfer relating to growing crops shall be presumed to be in violation of this section. Any person who violates the provisions of this section is guilty of an infraction."

It is clear that Chapter 41–09, N.D.C.C. (Article 9 U.C.C.), is subject to Chapter 35–05 and in the case of conflict between Chapter 41–09 and Chapter 35–05, the provisions of the latter control. *See* Section 41–09–16, N.D.C.C. (§ 9–203 U.C.C.).

A North Dakota Law Review article provides some history on the crop mortgage law:

"In 1932, crop mortgages on growing and unharvested crops were abolished in North Dakota by an initiated measure. That law declared such a mortgage to be a 'public nuisance and . . . a menace to the public health, welfare and well being of the people of the state. Subsequently, as the federal, state and local governments found it necessary to intervene in the general economic chaos of the 1930's, further legislation was deemed expedient. Thus, in 1933 an amendment was passed authorizing crop liens to be given to the United States, the state and any country, department, or agency of any of these, including the Bank of North Dakota. Other exceptions to the general rule were crop mortgages given as security for advances of loans for the purpose of paying government insurance premiums and for liens by contract given to secure the purchase price or rental of land upon which crops covered by the liens were to be grown. In addition another statute was passed in 1933 making it a misdemeanor to solicit or procure bills of sale or other transfers of title in order to evade the law prohibiting crop mortgages." White and Skjerven, *A Survey of Laws Affecting Farm Tenancy in North Dakota*, 37 N.D.L.Rev. 158, 181 (1961).

If we were to hold that the Delaney-Melland transactions are a sale and not subject to Chapter 41–09, N.D.C.C. (Article 9 U.C.C.), which we decline to do, the transactions would be void as violations of Chapter 35–05, N.D.C.C., relating to crop mortgages.

Delaney next argues that the district court improperly characterized this action as one for foreclosure; consequently, he was denied his right to a jury trial pursuant to the Seventh Amendment.[4]

In a pre-trial order of partial summary judgment, the district court, citing *C.I.T. Corporation v. Hetland*, 143 N.W.2d 94 (N.D.1966), determined that the action was "for foreclosure of a mortgage, which is subject to trial by the Court without a jury." The following language from *C.I.T. Corporation v. Hetland, supra,* is cited by Delaney as being supportive of his position that he was improperly denied a jury trial:

"The right to a trial by jury, in actions at law, with certain limitations, is a basic and fundamental part of our State and Federal systems of jurisprudence. Art. VII of Amends. to U. S. Constitution; Sec. 7 of N. D. Constitution. The method of preserving that right is provided for by our Rules of Civil Procedure. Rules 38 and 39(a), N.D.R.Civ.P. None of the exceptions provided for in the State and Federal Constitutions apply in this case. This court has held that a litigant has the right to have a jury decide disputed questions of fact in cases properly triable to a jury, unless he waives that right. *Kilgore v. Farmers Union Oil Co. of Epping*, 74 N.D. 640, 24 N.W.2d 26. The right to a jury trial is the same under our Rules of Civil Procedure as was true before such rules were adopted, except that, to preserve such right, a litigant now must make demand that the case be tried to a jury.

"The provision in our Constitution that right of trial by jury shall remain inviolate neither enlarges nor restricts that right, but merely preserves it as it existed

---

4. "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S.Const., amend. VII.

at the time of the adoption of our Constitution. Where the Constitution preserves the right of trial by jury in general terms, as our Constitution does, it preserves it for all cases in which it could have been demanded as a matter of right at common law. This right to a trial by jury is determined by the character of the issues as framed by the complaint. *Rivinius v. Huber,* 74 N.D. 773, 24 N.W.2d 911.

"In examining the complaint of the plaintiff in this case, we believe it is in form a complaint for the foreclosure of a lien. It is true that there is a demand for a money judgment, but that is true in the foreclosure of a lien. The complaint alleges that the holder of the contract has the election to seize, take, and sell the property described in the manner provided by law. The complaint then prays that the amount found to be due be decreed to be a valid lien upon the property described in the contract.

"We believe that the trial court correctly ruled that this was an equitable action, triable to the court without a jury." 143 N.W.2d at 100–101.

Delaney argues that the proper action against third party purchasers who have resold property that was allegedly subject to a security interest is an action for conversion.

■ PCA responds that under Rule 2, N.D.R.Civ.P., there is only one form of action, *i. e.* law and equity have been merged and the right to a jury trial is not dependent upon the cause of action asserted, but upon whether or not there are material issues of fact in dispute. PCA argues that Delaney has neither alleged any affirmative defenses nor challenged any of the district court's findings of fact; therefore, there are no questions of fact to be resolved by a jury. We agree. In *Dorgan v. Kouba,* 274 N.W.2d 167, 172–73 (N.D.1978), we stated on petition for rehearing that there must be a question of fact present before a party is entitled to a jury trial. In so holding, we quoted from *United States v. Anderson,* 584 F.2d 369 (10th Cir. 1978), that the right to a jury trial "turns on the nature of the issue to be tried rather than the character of the

overall action." *United States v. Anderson,* 584 F.2d at 373, citing *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). *See also Production Credit Association of Minot v. Geving,* 218 N.W.2d 185 (N.D. 1974).

■ Delaney also argues that PCA cannot reach the proceeds of Melland's crop in his possession. This argument is apparently related to his argument that the action should have been one for conversion rather than one for foreclosure. Although in the usual situation the debtor will receive the proceeds from the sale or disposition of the collateral, the Code does not provide that the proceeds must be received by the debtor. The pertinent parts of section 41–09–27, N.D.C.C. (§ 9–306 U.C.C.), read:

"41–09–27 (9–306) *'Proceeds'—Secured party's rights on disposition of collateral.—*

"1. 'Proceeds' includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds'. All other proceeds are 'noncash proceeds'.

"2. Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor." § 41–09–27(1), (2), N.D.C.C.

In *Farnum v. C. J. Merrill, Inc.,* 264 A.2d 150 (Me.1970), the Supreme Court of Maine dealt with this issue and concluded that the proceeds do not have to be received by the debtor:

"We find nothing to support Receiver's contention that the words 'whatever is received' in line one of 9–306(1) means 'whatever is received by debtor.' Para-

graph (1) does not impose that limitation and the fact that paragraph (2) expressly includes collections received by debtor argues that the proceeds in paragraph (1) has an independent meaning broad enough to include receipts by a receiver, as in *Lepley.* We are satisfied that paragraph (1) is to be read: ' "Proceeds" include whatever is received by anyone * * *.' " 264 A.2d at 156.

*See also Baker Production Cr. Ass'n v. Long Creek Meat Co., Inc.,* 266 Or. 643, 513 P.2d 1129 (1973).

The judgment of the district court is affirmed.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.